

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

SEP -5 2014

ARTHUR JOHNSTON
BY_____ DEPUTY

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### WESTERN DIVISION

Civil Action No.

5:14cv78 DCB-MTP

MIDWEST FEEDERS, INC.,

     Plaintiff,

v.

THE BANK OF FRANKLIN

     Defendant.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff Midwest Feeders, Inc. ("Midwest") hereby submits its Complaint against Defendant The Bank of Franklin ("Bank of Franklin") and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Midwest is a Kansas corporation. Midwest is a cattle feeding business based in Gray County, Kansas and as part of its business Midwest offers financing and credit to customers for procurement of livestock.

2.     Defendant Bank of Franklin is a state bank duly organized and existing under the laws of the state of Mississippi and is a wholly-owned subsidiary of Franklin Bancshares, Inc. with its principal place of business in Meadville, Mississippi.

3.     This Court has jurisdiction over this case under the provisions of 28 U.S.C. § 1332(a), *et seq.*, which grants the Court jurisdiction in civil actions on the basis of diversity of citizenship where the matter in controversy, exclusive of interest and costs, exceeds seventy-five

20014918.1

thousand dollars ($75,000).  Diversity of citizenship exists because Plaintiff Midwest is a citizen of Kansas with its principal place of business in Ingalls, Kansas, while Defendant Bank of Franklin is a citizen of Mississippi, with its principal place of business in Meadville, Mississippi. The amount in controversy is in excess of $30 million.

4.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(1), because a substantial part of the acts, events and omissions that gave rise to the claims for relief sought herein occurred in this District.

## GENERAL ALLEGATIONS

**A.    Robert Rawls, Robert Rawls Livestock, and Rawls Trucking, LLC.**

5.    Robert Rawls individually conducted business and also conducted business as Robert Rawls Livestock and Rawls Trucking, LLC (collectively, "Rawls").

6.    On March 18, 2014 Rawls confessed to the fraudulent activity described below.

7.    On August 26, 2014 Finney County, Kansas District Court entered a judgment in favor of Midwest and against Rawls in the amount of $30,283,566.86 plus ongoing interest and attorneys' fees.

8.    On August 28, 2014 Midwest deposed Rawls.  At his deposition Rawls invoked his right under the Fifth Amendment and refused to answer over 400 questions, including questions concerning the subject matter of this Complaint.

9.    Rawls is the sole member and managing principal of Rawls Trucking, LLC, which is the alter ego of Rawls.  Robert Rawls Livestock and Rawls Trucking, LLC, are operationally defunct and ceased doing business no later than March 17, 2014.

10.     Until May 2014, Rawls' business headquarters was at real property in Brookhaven, Mississippi (the "Brookhaven Facility").

**B.      The Fraud and Theft**

11.     In 2006, Rawls, individually and doing business as Robert Rawls Livestock, entered into a contractual relationship with Midwest in which Midwest provided Rawls secured financing through access to Deposit Account No. **4167[1] at Alva State Bank & Trust of Alva, Oklahoma (the "Alva State Bank Account"). Midwest provided its own money in the form of deposits to fund the Alva State Bank Account that Rawls used.

12.     Rawls was to use Midwest's money deposited in the Alva State Bank Account only to purchase livestock in which Midwest was to have a security interest.

13.     After purchasing the livestock, Rawls would contract to resell the purchased livestock through forward purchase contracts or on the spot market to livestock purchasers. Rawls was required to issue invoices to livestock purchasers and make arrangements for livestock purchasers to send their payments for the purchase price of the livestock to the Alva State Bank Account by delivery to a specified post office box in Alva, Oklahoma (the "Alva State Bank Lockbox"). Funds sent to the Alva State Bank Lockbox were to be used to repay Midwest's loan to Rawls.

14.     At some point, Rawls decided to steal from Midwest as follows:

        (a)     First, Rawls created fraudulent checks payable to purported cattle sellers ("Fraudulent Checks"). The Fraudulent Checks were fraudulent for a variety of reasons. For example, some of the purported cattle sellers did not exist, or were deceased, or did

---

[1] Redacted per F.R.Civ.P 5.2(a)(4).

not conduct business with Rawls.  In some instances, the purported cattle seller did exist and did do business with Rawls, but did not enter into the transaction which was the subject of the Fraudulent Checks.  In any event, no cattle existed to support the alleged purchases for which the Fraudulent Checks were issued ("Fictitious Cattle").

(b)     Second, Rawls would supply a fraudulent endorsement to the reverse side of the Fraudulent Checks by signing the name of the fictitious payee and then stamp the reverse side of the Fraudulent Checks with the language "For Deposit Only Robert Rawls Livestock."

(c)     Third, the Bank of Franklin accepted Fraudulent Checks for deposit by crediting Rawls' personal account number **1950[2] at the Bank of Franklin (the "Bank of Franklin Theft Account").

(d)     Fourth, the Bank of Franklin presented the Fraudulent Checks to Alva State Bank for payment on the Alva State Bank Account that Midwest funded.

(e)     Fifth, Alva State Bank as drawee, paid Bank of Franklin for the Fraudulent Checks.

(f)     Sixth, Midwest deposited money into the Alva State Bank Account to cover all checks written on the Alva State Bank Account by Rawls.

(g)     Seventh, Bank of Franklin credited the funds from the Fraudulent Checks to the Bank of Franklin Theft Account.

(h)     Eighth, Rawls withdrew the funds from the Bank of Franklin Theft Account for reasons other than purchasing cattle.  Those reasons included expenditures

---

[2] Redacted per F.R.Civ.P 5.2(a)(4).

for other unrelated businesses, personal lifestyle purposes and to fund personal investments.

15.     In March 2014, Midwest began noticing irregularities in the invoices and checks generated by Rawls. On March 18, 2014 Mr. Jeffrey H. Sternberger of Midwest met with Rawls at the Brookhaven Facility to discuss these irregularities.

16.     During this meeting on March 18, 2014, Rawls confessed to obtaining credit from Midwest through false pretenses. Specifically, Rawls confessed to drafting Fraudulent Checks and submitting fraudulent invoices to cover the scheme. Rawls showed Mr. Sternberger stacks of the Fraudulent Checks and corresponding fraudulent invoices. Rawls went on to confess that his fraud was so large there was no way he could possibly repay Midwest.

17.     Rawls further confessed to Midwest that he concealed his scheme from Midwest as outlined above.

18.     From the period of October 2013 through March 2014 Rawls issued at least 891 Fraudulent Checks and deposited them with forged signatures into his Bank of Franklin Theft Account totaling more than $85 million.

19.     Below is an example of a Fraudulent Check made out to a fictitious third-party, "Reid Lang." This carbon copy of the Fraudulent Check No. 019667 was one of dozens in a stack Rawls handed to Midwest on March 18, 2014 when Rawls confessed his fraudulent activities. Rawls, using a carbon copy form, drafted a check on February 6, 2014 in the amount of $106,047.82 purportedly for cattle Rawls was purchasing from "Reid Lang." In fact, Rawls did not purchase any cattle from Reid Lang on that date. The bottom of this carbon copy form is

a copy of the Fraudulent Check for this transaction evidencing an alleged payment for these Fictitious Cattle by a draw on the Alva State Bank Account that Midwest funded.

**ROBERT RAWLS LIVESTOCK**

Office 601-833-0077
Fax 601-833-0003

P.O. Box 3220
Brookhaven, Mississippi 39603-7220

Home: 601-835-[illegible]
Cell: 601-757-[illegible]

DATE 2-10-14

SELLER Reid Lang

ADDRESS

BUYER

| NO. HD. | DESCRIPTION | WEIGHT | SHRINK | NET WT. | AV. WT. | PRICE | AMOUNT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| | |
|---|---|
| | |
| BEEF CHECKOFF | |
| LESS DOWN PAYMENT | |
| TOTAL DEDUCTIONS | |
| NET PROCEEDS | 106,047.82 |

ROBERT RAWLS LIVESTOCK
P.O. Box 3220
Brookhaven, Mississippi 39603-7220
601-833-0077

ALVA STATE BANK
ALVA, OK
86-187/1031

NO. 019667

2-6 20 14

PAY to the order of Reid Lang [illegible]

$ 106,047.82

[illegible] DOLLARS

ROBERT RAWLS LIVESTOCK

20.     In the ordinary course of business, the bank statements provided to Midwest from Alva State Bank did not include copies of the reverse side of checks that were drawn on the Alva State Bank Account by Rawls.  After March 18, 2014, when Rawls confessed to his fraudulent activity, Midwest requested copies of the fronts and backs of the checks that were among the dozens of carbon copy Fraudulent Checks handed to Midwest during his March 18, 2014 confession, including the carbon copy of the check to "Reid Lang" above.

21.     When Alva State Bank provided copies of both sides of the suspect checks in June 2014, Midwest was for the first time able to detect Rawls' scheme.  By way of example, the handwritten check, No. 019667 dated February 6, 2014, drawn on the Alva State Bank Account was made payable to "Reid Lang" in the amount of $106,047.82 and signed by Rawls:



22.     Rawls fraudulently endorsed the signature of "Reid Lang" on the back of this check and deposited the check into his personal account at Bank of Franklin for credit in the amount of $106,047.82, as indicated below:



23.     During his deposition taken under oath on August 28, 2014, Robert Rawls was asked if he could provide any facts to substantiate that check No. 019667 made payable to "Reid Lang" was part of a legitimate business transaction involving the purchase of cattle.   Rawls invoked his right under the Fifth Amendment and refused to answer this question.  When shown 891 other Fraudulent Checks, Rawls likewise invoked his right under the Fifth Amendment and refused to answer any questions related to these instruments.

24.     In order to cover his scheme, Rawls generated fraudulent invoices to fictitious livestock purchasers ("Fraudulent Sale Invoices").  The Fraudulent Sale Invoices were intended to provide cover for continued issuance of Fraudulent Checks so as to create an expectation that Fictitious Cattle had been sold on forward contracts or on the spot market.

25.     During his meeting with Mr. Jeffrey Sternberger of Midwest on March 18, 2014, Rawls handed to Mr. Sternberger 289 Fraudulent Sale Invoices admitting to his fraudulent conduct.

26.     During his deposition under oath on August 28, 2014, Mr. Rawls was asked if he could provide any facts that would demonstrate any legitimate business transactions involving sale of cattle associated with the Fraudulent Sale Invoices.  Rawls invoked his right under the Fifth Amendment and refused to answer questions related to the 289 Fraudulent Sale Invoices.

**C.     Bank of Franklin's Participation in Rawls' Wrongdoing**

27.     In June 2014, when Midwest first obtained copies of both sides of the handwritten checks fraudulently drawn on the Alva State Bank Account showing fraudulent payee endorsements by Rawls, the magnitude of the fraud and Rawls' use of the Bank of Franklin account as part of the fraud became apparent.  Although Midwest's research is still underway, the records Midwest has been able to reconstruct show the following concerning Fraudulent Checks made payable to fictitious third-party payees, that were fraudulently endorsed by Rawls in the name of the fictitious payees and then deposited into his Bank of Franklin account in the six-month period of time between October 2013 and March 2014:

a)     **October 2013:** 164 handwritten checks to fictitious payees accepted for deposit by Bank of Franklin totaling $15,164,268.54;

b)     **November 2013:** 153 handwritten checks to fictitious payees accepted for deposit by Bank of Franklin totaling $14,800,413.48;

c)     **December 2013:** 159 handwritten checks to fictitious payees accepted for deposit by Bank of Franklin totaling $15,310,547.06;

d)     **January 2014:** 166 handwritten checks to fictitious payees accepted for deposit by Bank of Franklin totaling $16,193,316.15;

e)     **February 2014:** 145 handwritten checks to fictitious payees accepted for deposit by Bank of Franklin totaling $14,335,372.76;

f)     **March 2014:** 104 handwritten checks to fictitious payees accepted for deposit by Bank of Franklin totaling $10,007,665.45

28.     Based on Midwest's preliminary research, in the six-month timeframe between October 2013 and March 2014, Bank of Franklin accepted for deposit from Rawls for credit to the Bank of Franklin Theft Account at least 891 handwritten Fraudulent Checks made payable to third-party payees totaling $85,811,583.44.   All of these Fraudulent Checks have fraudulent endorsements of fictitious payees and were accepted for deposit to Rawls' personal account by Bank of Franklin.

29.     Bank of Franklin, upon information and belief, made absolutely no inquiry to Rawls in order to obtain an explanation why more than $85 million of checks, handwritten by Rawls and payable to third-party payees, were purportedly endorsed by the third-party payees but were being deposited by Rawls into his personal account at the Bank of Franklin.  The Bank of Franklin's failure to inquire was at the root of the fraudulent activity and Midwest's losses.

30.     Upon information and belief, the amount of deposits by Rawls involving Fraudulent Checks with forged endorsements to fictitious payees, represented a significant percentage of all deposits for all customers accepted by the Bank of Franklin in its Brookhaven branch on a month to month basis since at least October, 2013.  Rawls' theft using the Bank of Franklin Account was a material component of the Bank of Franklin's overall business.

31.     Upon information and belief, Bank of Franklin failed or refused to make any inquiry to Alva State Bank concerning the irregular and fraudulent banking activities by Rawls. Bank of Franklin further failed or refused to make any inquiry to Midwest, which funded the Alva State Bank Account, concerning the irregular and fraudulent banking activities by Rawls through use of his personal Bank of Franklin Theft Account.

32.     Upon information and belief, Bank of Franklin took no steps to investigate, detect, report, or disclose Rawls' obviously suspicious banking activity to any regulatory or law enforcement agency before Rawls confessed to his fraud and ceased doing business in March, 2014.

33.     Bank of Franklin did not follow reasonable commercial bank practices or FDIC guidelines in failing to investigate, detect, report, or disclose the fraudulent scheme undertaken by Rawls.

34.     Upon information and belief, Bank of Franklin may have violated several statutes including the Bank Secrecy Act, the Patriot Act, and other applicable anti-money laundering and suspicious activity reporting requirements by failing to investigate, detect, report, or disclose the suspicious banking activity perpetrated by Rawls.

35.     Upon information and belief, despite becoming aware of facts that should have triggered further scrutiny of suspicious activity related to accepting millions of dollars in third-party payee checks for deposit by Rawls, Bank of Franklin failed or refused to timely file reports as required by law with the Department of Treasury's Financial Crimes Enforcement Network at any time before Rawls admitted his fraud and ceased doing business in March, 2014.

36.     Upon information and belief, despite becoming aware of facts that should have triggered further scrutiny of suspicious activity related to accepting millions of dollars in third-party payee checks for deposit by Rawls, Bank of Franklin failed or refused to terminate its relationship with Rawls or terminate his use of the Bank of Franklin Theft Account.   This conduct by Bank of Franklin allowed Rawls to continue his fraudulent scheme.

37.     The Bank of Franklin's failure to inform Midwest or Alva State Bank of Rawls' irregular and fraudulent banking activities is especially egregious in light of the fact that the Bank of Franklin swept Rawls' account on at least a monthly basis for payment of Rawls' loan obligations held by the Bank of Franklin.

## FIRST CLAIM FOR RELIEF
### (Miss. Code § 75-3-420 – Conversion of Instruments)

38.     Midwest hereby incorporates the allegations set forth in the foregoing paragraphs of the Complaint as though fully set forth herein.

39.     Miss. Code § 75-3-420 provides in pertinent part as follows:

> The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment.

40.     Rawls, because he fraudulently prepared and fraudulently endorsed the Fraudulent Checks, was not a person entitled to enforce the instruments or receive payment. The Bank of Franklin converted the instruments because it obtained payment of the Fraudulent Checks for a person not entitled to enforce the instrument or receive payment.

41.     The Uniform Commercial Code comment to Miss. Code § 75-3-420 provides as follows: *"The second sentence of section 3-420(a) states that an instrument is converted if it is taken by transfer other than a negotiation from a person not entitled to enforce the instrument or taken for collection or payment from a person not entitled to enforce the instrument or receive payment. This covers cases in which a depository or payor bank takes an instrument bearing a forged endorsement."* (Emphasis added).

42.     Bank of Franklin committed conversion by allowing negotiable instruments, as defined under Miss. Code Ann. § 75-3-104(a), to be deposited by Rawls and credited to his account over forged signatures when Rawls had no right to enforce the negotiable instruments or receive payment.

43.     Bank of Franklin had a duty to inquire as to account transactions by Rawls involving tens of millions of dollars of handwritten checks to third-party payees being deposited into Rawls' personal Bank of Franklin Theft Account.

44.     Bank of Franklin acted in bad faith by its repeated pattern of accepting for deposit the Fraudulent Checks without inquiry and by refusing to repay the amounts to Midwest represented by such instruments.  The acceptance for deposit and cashing of the Fraudulent Checks in question and the refusal to repay the monies in question is in direct contravention of commercially reasonable practices and has resulted in the conversion of instruments described above.

45.     As a direct and proximate result of the Bank of Franklin's conversion, Midwest has suffered damages totaling more than $30,000,000.

46.     Bank of Franklin's conduct, actions and inactions warrant the imposition of punitive damages.

### SECOND CLAIM FOR RELIEF
### (Miss. Code § 75-3-404(d) – Failure to Exercise Ordinary Care)

47.     Midwest hereby incorporates the allegations set forth in the foregoing paragraphs of the Complaint as though fully set forth herein.

48.     Miss. Code § 75-3-404(d) provides, in pertinent part, related to instruments involving fictitious payees:

> [I]f a person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from payment of the instrument, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

49.     Miss. Code § 75-4-103(e) provides, in part, as follows:

> [T]he measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. If there is also bad faith it includes any other damages the party suffered as a proximate consequence.

50.     Bank of Franklin's conduct, actions, and inactions as set forth above constitute failure to exercise ordinary care and failure to follow commercially reasonable banking standards and practices to adequately investigate, discover, report and disclose the fraudulent activities of Rawls.

51.     Bank of Franklin's failure to exercise ordinary care and failure to follow commercially reasonable banking practices was accompanied by bad faith by its repeated pattern of accepting for deposit the Fraudulent Checks without inquiry.

52.     As a direct and proximate result of the actions and inactions of the Bank of Franklin, Midwest has been damaged in amount no less than $30,000,000.

## THIRD CLAIM FOR RELIEF
### (Common Law Conversion of Funds)

52.     Midwest hereby incorporates the allegations set forth in the foregoing paragraphs of the Complaint as though fully set forth herein.

53.     To the extent Defendant asserts that Miss. Code § 75-3-420 is inapplicable to the factual allegations herein or does not permit a statutory cause of action to Midwest, Midwest alternatively pleads as follows.

54.     Midwest, by its agreement with Rawls, had an interest in the checks drafted by Rawls, which were intended to purchase live cattle subject to Midwest's security interest. Midwest's interest in the Fraudulent Checks arises out of the fact Midwest was obligated to deposit funds to the Alva State Bank Account to cover checks drawn on the Alva State Bank Account by Rawls.

55.     By accepting the Fraudulent Checks for deposit, Bank of Franklin exercised dominion and control over Midwest's property interest and wrongfully deprived Midwest of money by accepting Fraudulent Checks for deposit and making collection thereon from the Alva State Bank Account funded by Midwest.

56.     Bank of Franklin converted funds because it obtained payment of the Fraudulent Purchase Checks over fraudulent endorsements by a fictitious payee, when Rawls had no right to enforce the negotiable instrument. Bank of Franklin's conduct resulted in its improper exercise of dominion and control over Midwest's funds rendering Bank of Franklin liable to Midwest for conversion.

57.     Bank of Franklin acted in bad faith by its repeated pattern of accepting for deposit the Fraudulent Checks without inquiry and by refusing to repay the amounts to Midwest

represented by such instruments.   The acceptance for deposit and cashing of the Fraudulent Checks in question and the refusal to repay the monies in question is in direct contravention of commercially reasonable practices and has resulted in the conversion of funds described above.

58.     As a direct and proximate result of the Bank of Franklin's conversion, Midwest has suffered damages totaling more than $30,000,000.

59.     Bank of Franklin's conduct, actions and inactions warrant the imposition of punitive damages.

## FOURTH CLAIM FOR RELIEF
### (Negligence)

60.     Midwest hereby incorporates the allegations set forth in the foregoing paragraphs of the Complaint as though fully set forth herein.

61.     Miss. Code § 75-4-103 imposes upon banks the affirmative duty to use good faith and the exercise of ordinary care.

62.     The Uniform Commercial Code comment to Miss. Code § 75-4-103 provides as follows: *"Under this Article banks come under the general obligations of the use of good faith and the exercise of ordinary care.  'Good Faith' is defined in § 3-103(a)(4).  The term 'Ordinary Care' is defined in § 3-103(a)(7).  These definitions are made to apply to Article 4 by § 4-104(c)."* Comment 4 (emphasis added).

63.     Bank of Franklin had an affirmative duty to exercise ordinary care in taking negotiable instruments for deposit and payment arising not only under its obligation under Mississippi U.C.C. provisions, but its own corporate policies, commercially reasonable banking

standards, and regulations to prevent misuse of accounts under the control of Bank of Franklin for purposes of fraud, conversion or other illegal activities.

64.     Bank of Franklin's conduct, actions, and inactions as set forth above constitute failure to exercise ordinary care and failure to follow commercially reasonable banking standards and practices to adequately investigate, discover, report, and disclose the fraudulent activities of Rawls.

65.     Bank of Franklin's failure to exercise ordinary care and failure to follow commercially reasonable banking practices was accompanied by bad faith by its repeated pattern of accepting for deposit the Fraudulent Checks without inquiry.

66.     As a direct and proximate result of the actions and inactions of the Bank of Franklin, Midwest has been damaged in an amount no less than $30,000,000.

### FIFTH CLAIM FOR RELIEF
#### (Negligent Hiring and Supervision)

67.     Midwest hereby incorporates the allegations set forth in the foregoing paragraphs of the Complaint as though fully set forth herein.

68.     Bank of Franklin had an affirmative duty to properly train and supervise its employees, specifically its tellers, with respect to reporting guidelines under the Bank Secrecy Act, its own corporate policies, and commercially reasonable banking standards to prevent misuse of accounts under the control of Bank of Franklin for the purpose of fraud, conversion, and the violation of applicable state and Federal laws.

69.     Bank of Franklin knew or should have known that its employees behaved in an improper or otherwise incompetent manner by allowing Rawls to deposit or cash the Fraudulent Checks with fraudulent endorsements without making any inquiry concerning why of tens of

millions of dollars of checks payable to third-party payees were being deposited into Rawls' personal account at the Bank of Franklin.

70.     Bank of Franklin, having this knowledge, failed to supervise its employees adequately, or failed to take other actions to prevent harm to Midwest.  The employees were in the course and scope of their employment with Bank of Franklin during the time they permitted deposit of the Fraudulent Checks and facilitated Rawls' fraudulent scheme.

71.     Bank of Franklin is liable for its negligence in failing to properly instruct its employees, or failing to assure that the corporate policies of the Bank were followed, and Bank of Franklin knew or should have known that its employees were not following Bank policies in accepting deposit of the Fraudulent Checks.

72.     Bank of Franklin knew, or should have known, that failure to exercise ordinary care and failure to follow reasonable banking standards and practices in hiring and supervising its employees could result in financial loss to any party that had interests in the Fraudulent Checks taken for deposit and payment by the Bank of Franklin.

73.     As a direct and proximate result of Bank of Franklin's negligent hiring and supervision, Midwest has been damaged in an amount of at least $30,000,000.

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**(Civil Conspiracy)**

</div>

74.     Midwest hereby incorporates the allegations set forth in the foregoing paragraphs of the Complaint as though fully set forth herein.

75.     Bank of Franklin, upon information and belief, has specific deposit limits for its bank tellers with varying levels of supervisory approval necessary.

76.     Bank of Franklin, upon information and belief, has internal standards and policies requiring tellers to know the endorsements of the people with whom he or she is dealing because the Bank must guarantee prior endorsements when transferring instruments for collection.

77.     Upon information and belief, Rawls had a personal relationship with one or more of the Bank officers who had supervisory authority at the Brookhaven Branch of Bank of Franklin.

78.     In the six month period of time between October 2013 and March 2014, the Bank of Franklin accepted for deposit from Rawls at least 891 handwritten Fraudulent Checks made payable to third party payees totaling more than $85 million for credit to Rawls personal Bank of Franklin Theft Account.

79.     Despite its own internal policies and procedures, Bank of Franklin, upon information and belief, took no steps to investigate, detect, report, or disclose Rawls' obviously suspicious banking activities to any regulatory or law enforcement agency before Rawls confessed to his fraud and ceased doing business in March, 2014.

80.     During his deposition on August 28, 2014, Rawls was specifically asked whether he gave anything of value to any employee, officer, or director of Bank of Franklin as part of his scheme to deposit the Fraudulent Checks for credit to his Bank of Franklin Theft Account. Rawls invoked his right under the Fifth Amendment and refused to answer these questions, including additional questions regarding transactions with anyone associated with Bank of Franklin.

81.     The pattern of activity, allowing hundreds and hundreds of handwritten checks made out to third party payees, totaling more than $85 million, to be deposited into Rawls'

personal Bank of Franklin Theft Account without proper inquiry is circumstantial evidence establishing knowledge of, and consent to, Rawls' fraudulent activities on the part of an employee or officer of Bank of Franklin.

82.     Upon information and belief, an agreement existed between Rawls and one or more persons at the Bank of Franklin to accomplish an unlawful purpose related to Rawls' suspicious and fraudulent check writing activity.

83.     Upon information and belief, Rawls, with the knowledge and consent of one or more employees of Bank of Franklin, undertook overt acts in furtherance of this agreement to accomplish an unlawful purpose by allowing the continued deposit of Fraudulent Checks into Rawls' personal Bank of Franklin Theft Account.

84.     As a direct and proximate result of this conduct by the Bank of Franklin, Midwest has suffered damages totaling more than $30 million.

85.     Bank of Franklin's conduct, actions and inactions warrant the imposition of punitive damages.

## **PRAYER FOR RELIEF**

Midwest respectfully requests that this Court enter judgment in its favor and against Bank of Franklin as follow:

(a)     For judgment in favor of Midwest and against Bank of Franklin on Claims I-VI;

(b)     For judgment in favor of Midwest and against Bank of Franklin for compensatory damages in amount no less than $30,000,000;

(c)     For judgment in favor of Midwest and against Bank of Franklin for punitive damages based upon the bad faith conduct of Bank of Franklin in an amount to be proven at trial;

(d)     For all pre-judgment and post-judgment interest allowable by law;

(e)     For all attorneys' fees and costs allowable by law; and

(f)     For such other and further relief as this Court deems proper.

**MIDWEST FEEDERS, INC. HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE HEREIN.**

Respectfully submitted this ___4th___ of September, 2014.

> BAKER, DONELSON, BEARMAN
> CALDWELL & BERKOWITZ, PC
>
> R. Spencer Clift, III (MS #100208)
> Erno Lindner (MS #104073)
> 165 Madison Avenue, Suite 2000
> Memphis, TN  38103
> Telephone: (901) 577-2216
> Fax:  (901) 577-0834
> Email: sclift@bakerdonelson.com
>
> and
>
> John O'Brien
> Timothy G. O'Neill
> Scott C. Sandberg
> Snell & Wilmer L.L.P.
> 1200 Seventeenth Street, Suite 1900
> Denver, Colorado 80202
> Telephone:  (303) 634-2000
> Fax:  (303) 634-2020
> Email: jobrien@swlaw.com; toneill@swlaw.com
> **Counsel for Plaintiff, Midwest Feeders, Inc.**