IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

MIDWEST FEEDERS, INC.                          PLAINTIFF

v.                          CIVIL ACTION NO. 5:14-cv-78-DCB-MTP

BANK OF FRANKLIN                               DEFENDANT

MEMORANDUM OPINION AND ORDER

This cause is before the Court on defendant Bank of Franklin's Motion for Summary Judgment (**docket entry 321**) and motions to exclude the opinions and testimony of Edward Cordes (**docket entry 302**), Cathy C. Glassman (**docket entry 306**), and John D. Barthel (**docket entry 316**).  Having carefully considered the motions, responses, and applicable law, and being otherwise fully informed in the premises, the Court finds as follows:

I.   Facts and Procedural History

This case arises from the Bank of Franklin's alleged involvement in a "fictitious payee" scheme orchestrated against Midwest Feeders, Inc. ("Midwest Feeders" or "Midwest") by Robert Rawls, a Bank of Franklin customer.  Midwest Feeders is a commercial cattle feedlot business based in Gray County, Kansas.  Doc. 1, ¶ 1.  The Bank of Franklin is a community bank with branches in Brookhaven and Meadville, Mississippi.  Id.

In an effort to expand its operations, Midwest Feeders entered the cattle "clearing" business in 2006.  See Doc. 383-17.  By entering into these arrangements with its customers, Midwest would

1

provide financing and lines of credit to customers for the procurement of livestock. Id. In that same year, Midwest Feeders entered into a clearing agreement with Robert Rawls, who conducted business individually and through Robert Rawls Livestock and Rawls Trucking, LLC (collectively, "Rawls"). Id. at 13; Doc. 383-73. Midwest entered into this agreement after obtaining favorable recommendations about Rawls from other customers. Doc. 383-17, p. 30.

Pursuant to the clearing arrangement between Rawls and Midwest Feeders, Midwest would deposit money into an account at Alva State Bank & Trust of Alva, Oklahoma ("Alva") for Rawls to use for the purchase of livestock in exchange for a security interest in the livestock purchased. Id.; Doc. 1, ¶ 11. The agreement was structured so that Rawls could write a check drawn on the Alva account to purchase cattle, and the cattle would be put into inventory. The account was styled "Robert Rawls Livestock." See Doc. 383-36; Doc. 383-70; Doc. 383-42. After a check on this account was issued, Midwest would fund the Alva account to cover the check drawn by Rawls. Doc. 383-17, p. 55. The cattle in inventory would then be sold, creating an account receivable, with proceeds from the cattle purchaser being paid directly to the Alva account. Id. The payment was to be made by purchasers via deposits to a post office lock box controlled by Alva. Id. Deposits from the purchaser would then be credited to

2

Rawls' outstanding accounts receivable. Id.  In exchange for its funding, Midwest received compensation through fees and interest on outstanding funds. Id.

In 2010, Rawls became a customer of the Bank of Franklin, a banking relationship which consisted of two commercial loans and a checking account in the name of Robert Rawls Livestock. See Doc. 383-9; Doc 321-21; Doc. 383-32. Rawls came to the bank after Charles Magee, executive vice president and loan committee member, solicited his business. Doc. 383-9, p. 22. Magee and Rawls had known each other for 30 years, and the two socialized on occasion. See Id.  Magee oversaw Rawls' accounts while he was a customer of the bank, processing his loans and approving wire transfers when necessary. See Doc. 383-9. On several occasions, Magee approved transfers from Rawls' checking account when the balance was in the negative. Id.  According to Magee, if Rawls' line of credit was sufficient to cover the transaction or if Rawls indicated that he planned to deposit funds into his checking account, Magee would approve the wire. Id.

At some point during Rawls' business dealings with Midwest Feeders, Rawls created fictitious cattle purchases and diverted money from the Alva account for his personal use. Doc. 1, ¶ 14. Rawls made out checks to fictitious payees drawn on the Alva account and endorsed them and stamped them as payable to his livestock company for deposit only.  Rawls then deposited the

checks into his checking account at Bank of Franklin, which turned them over to Alva for payment. See Doc. 383-77. In an effort to disguise these transactions as legitimate, Rawls also created fictitious invoices to accompany the checks. See Doc. 383-17, p. 215. In March of 2014, Rawls confessed his scheme to Midwest president, Jeff Sternberger, who then notified Charles Magee.[1] Id.

In 2011, prior to Rawls' confession, executives at the Bank of Franklin made an inquiry concerning Rawls' account and deposit transactions, specifically his uncollected funds balance and the checks being deposited into his checking account. See Doc. 383-1; Doc. 383-2; Doc. 383-8. The type of checks deposited by Rawls were uncommon at the bank,[2] and Magee was instructed to speak with Rawls about the nature of these deposits. Doc. 383-3, p. 129; Doc. 383-9, p. 72. When asked about the checks, Rawls explained that these transactions were common practice in the cattle industry. Doc. 838-9, p. 73. Being satisfied with this explanation, the Bank conducted no further investigation into Rawls' account activity. See Doc. 838-9; Doc. 383-8.

On September 5, 2014, Midwest Feeders filed suit against Bank of Franklin, alleging six claims against the bank in connection with Rawls' fraudulent scheme. The Court dismissed two claims at

---

[1] In August 2014, the District Court of Finney County, Kansas entered a judgment against Rawls in favor of Midwest in the amount of $30,283,566.86. Doc. 1, ¶ 7.

[2] The checks in question appeared to be drawn on the Alva account to third party payees, then endorsed by the third party and stamped as payable to Rawls.

the motion to dismiss stage, and four claims remain pending:
failure to exercise ordinary care under Mississippi Code Section
75-3-404(d), negligence, negligent hiring and supervision, and
civil conspiracy.  Bank of Franklin filed its Motion for Summary
Judgment, along with motions to exclude the opinions and testimony
of three expert witnesses designated by Midwest Feeders.

## II. Motion for Summary Judgment

### A. Standard of Review

Summary judgment shall be granted "if the movant shows that
there is no genuine dispute as to any material fact and that the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a).  A "material fact" is one that might affect the outcome
of the suit under the governing law. Spansel v. State Farm, 683 F.
Supp. 2d 444, 447 (S.D. Miss. 2010).  A genuine dispute exists
when the evidence is such that a reasonable jury could return a
verdict for the nonmoving party. Id.  In determining whether there
is a genuine dispute as to any material fact, the Court considers
all of the evidence in the record but refrains from making
credibility determinations or weighing the evidence. Flock v.
Scripto-Tokai, 319 F.3d 231, 236 (5th Cir. 2003).

A party moving for summary judgment "bears the initial
responsibility of informing the district court of the basis for
its motion, and identifying those portions of [the record] which
it believes demonstrate the absence of a genuine issue of material

fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party makes such a demonstration, the burden shifts to the nonmovant to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." <u>Estate of Sanders v. U.S.</u>, 900 F.Supp.2d 730, 733 (S.D. Miss. 2012).

The Court views the evidence and draws reasonable inferences in the light most favorable to the nonmovant.  <u>Maddox v. Townsend and Sons, Inc.</u>, 639 F.3d 214, 215 (5th Cir. 2011).  But in the absence of any proof, the Court will not assume that the nonmoving party could or would prove the necessary facts. <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994).

*B. Discussion*

### 1. Failure to Exercise Ordinary Care

Midwest Feeders brings its first claim against Bank of Franklin for failure to exercise ordinary care under the Uniform Commercial Code ("UCC"), as codified by Mississippi Code Annotated Section 75-3-404(d).  The statute provides:

> With respect to an instrument to which subsection (a) or (b) applies, if a person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from payment of the instrument, the <u>person bearing loss</u> may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

Miss. Code Ann. § 75-3-404(d) (emphasis added).  Bank of Franklin argues that Midwest lacks standing to recover under Section 75-3-

404 because Midwest was not a party to any of the checks deposited into Rawls' Bank of Franklin account.   In response, Midwest maintains that Mississippi's fictitious payee statute provides a right of recovery for *any* person who suffers loss caused by a bank's failure to exercise ordinary care in taking forged instruments.

Although Midwest's argument hinges on the phrase "person bearing loss," this statutory language does not exist in a vacuum. The legislature's intention must be determined by the total language of the statute, and "the Court looks to the whole of the statute to avoid adhering to one sentence or phrase […] in a way that skews its true meaning." Manufab, Inc. v. Miss. State Tax Comm'n, 808 So. 2d 947, 949 (Miss. 2002).   Article 3 of the UCC governs parties' rights and relationships with respect to negotiable instruments. See Miss. Code Ann. § 75-3-102.   The remedies provided by the UCC "must be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." § 75-1-305(a).   An "aggrieved party" is defined as "a party entitled to pursue a remedy." § 75-3-103(a).   There are three categories of persons entitled to enforce negotiable instruments under Article 3:

> "Person entitled to enforce" an instrument means (i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to

> Section 75-3-309 or 75-3-418(d).[3] A person may be a
> person entitled to enforce the instrument even though
> the person is not the true owner of the instrument or is
> in wrongful possession of the instrument.

Miss. Code Ann. § 75-3-301.

By its own account, Midwest Feeders cannot qualify as a "person entitled to enforce" the checks deposited into Rawls' Bank of Franklin account.  Midwest was not a party to any of the instruments — it was not the payee or the drawer on the checks, and Midwest never possessed any of the checks at issue.  While Midwest Feeders may have an interest in the funds behind the forged checks, "an interest in funds backing the checks" is not the same as "an interest in the checks themselves." Am. Nat'l Ins. Co. v. Citibank, N.A., 543 F.3d 907, 910 (7th Cir. 2008) (holding that a party with only an equitable interest in a check could not assert a claim for conversion under a UCC provision identical to the section codified by the Mississippi legislature). Because Midwest is not a "person entitled to enforce" the instrument under Article 3, it necessarily follows that Midwest cannot maintain a cause of action against Bank of Franklin under Section 75-3-404(d).[4]

---

[3] Section 75-3-309 governs the enforcement of lost, destroyed, or stolen instruments, and Section 75-3-418(d) applies when an instrument is paid or accepted by mistake and the payor or acceptor recovers payment or revokes acceptance. Neither of these provisions are applicable here.

[4] In a substantially similar case, the United States District Court for the Middle District of Georgia also held that Midwest Feeders lacked standing to sue under Georgia's UCC where Midwest was not a "person entitled to enforce an instrument" under the statute. See Midwest Feeders v. Regions Bank (Inc.) (Alabama), 2016 WL 5796894, *4 (M.D. Ga. Sept. 30, 2016).

Though the case law interpreting Section 75-3-404(d) appears
to be void of any interpretation as to who may qualify as a "person
bearing loss," the official comments to the UCC are instructive
insofar as they suggest circumstances in which the drafters
envisioned recovery under the fictitious payee statute.[5]  As the
comments explain, Section 3-404 was enacted as a comparative loss
provision, allocating liability between parties to the instrument:

> But in some cases the person taking the check might have
> detected the fraud and thus have prevented the loss by
> the exercise of ordinary care. In those cases, if that
> person failed to exercise ordinary care, it is
> reasonable that the person bear loss to the extent the
> failure contributed to the loss.  Subsection (d) is
> intended to reach that result. It allows the person who
> suffers loss as a result of payment of the check to
> recover from the person who failed to exercise ordinary
> care. In Case #1, Case #2, and Case #3, the person
> suffering the loss is Corporation, the <u>drawer</u> of the
> check. In each case the most likely defendant is the
> depository bank that took the check and failed to
> exercise ordinary care. In those cases, the drawer has
> a cause of action against the offending bank to recover
> a portion of the loss.
> …
>
> If the depository bank failed to exercise ordinary care
> and the failure substantially contributed to the loss,
> the <u>drawer</u> in Case #4 or the <u>drawee</u> bank in Case #5 has
> a cause of action against the depository bank under
> subsection (d).

U.C.C. § 3-404, cmt. 3 (emphasis added).  Though the list is not
exhaustive, the case illustrations provided in the comments each

---

[5]Though the comments have not been adopted by the Mississippi legislature,
"[s]till we look to official comments about uniform laws, when those laws have
been adopted all but verbatim by the legislature, as the most informed source
explaining provisions of the original enactment." <u>Holifield</u>, 891 So. 2d at 248.

depict scenarios in which the injured party is the drawer or maker of the check, and none of the examples anticipate recovery for a third party, like Midwest Feeders, which has no relationship with the depository bank and is otherwise unidentified by the instrument.

Midwest has not cited to any legal authority granting a person or entity in its position a right to recover against a bank under the UCC.[6]   The Court is similarly unaware of any circumstances which would allow a plaintiff to recover on a negotiable instrument under Article 3 without first having an interest in the instrument itself.   Accordingly, the Court finds that Midwest Feeders cannot maintain its claim against the Bank of Franklin under Section 75-3-404(d), and summary judgment shall be granted on the remaining UCC claim.

## 2. Negligence Claims

Midwest Feeders brings two claims in negligence against the Bank of Franklin: pure negligence and negligent hiring and supervision.   In Mississippi, the traditional elements of negligence are: "duty or standard of care, breach of that duty or standard of care, proximate causation, and damages or injury."

---

[6] Midwest cites one Michigan case in an effort to demonstrate that other courts have allowed non-party plaintiffs to recover for failure to exercise ordinary care under the UCC. See Hantz Fin. v. Chemical Bank, 2014 WL 5500383 (Mich. Ct. App. 2014) (allowing recovery where the plaintiff was not a party to the instruments, but where the plaintiff was the intended payee).  But the facts in this case are distinguishable from Hanz Fin. Midwest Feeders was never listed as payee, nor were any of the checks intended for Midwest.

Lyle v. Mladinich, 584 So. 2d 397, 398 (Miss. 1991).  Thus, in order "[t]o prevail on any type of negligence action, a plaintiff must first prove the existence of a duty." Douglas v. Trustmark Nat'l Bank, 2016 WL 4442829, *4 (S.D. Miss. Aug. 17, 2016) (citing Enterprise Leasing Co. v. Bardin, 8 So. 3d 866, 868 (Miss. 2009)). Bank of Franklin maintains that it is entitled to summary judgment on both negligence-based claims because the bank owed no duty to Midwest Feeders.

Relying on a wealth of cases from other jurisdictions, Bank of Franklin urges the Court to apply "[t]he almost-universal rule that banks do not owe a common law duty of care to third-party non-customers." VIP Mortgage Corp. v. Bank of America, N.A., 769 F. Supp. 2d 20, 27 (D. Mass. 2011); see Lerner v. Fleet Bank, N.A., 459 F.3d 273, 286 (2d Cir. 2006) ("banks do not owe non-customers a duty to protect them from the intentional torts of their customers").[7]  Notably, courts within the Fifth Circuit have also

---

[7] See also SFS Check, LLC v. First Bank of Del., 774 F.3d 351, 357 (6th Cir. 2014); Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 225 (4th Cir. 2002); Conder v. Union Planters Bank N.A., 384 F.3d, 397, 400 (7th Cir. 2004); Wiand v. Wells Fargo Bank, N.A., 938 F.Supp.2d 1238 (M.D. Fla. 2013); Chaney v. Dreyfus Service Corp, 595 F.3d 219, 232 (5th Cir. 2010) (applying New York law); Old Republic Nat. Title Ins. Co. v. Landmark Closing Co., 2010 WL 2228436, *2 (E.D. Ark. 2010); Public Service Co. of Okla. v. A Plus, Inc., 2011 WL 3329181, *7 (W.D. Okla. 2011); Volpe v. Fleet Nat. Bank, 710 A.2d 661, 664 (R.I. 1998) (depository bank owed no duty of care to non-customer payee whose indorsement was forged); Weil v. First Nat. Bank of Castle Rock, 983 P.2d 812, 814 (Colo. Ct. App. 1999); McCallum v. Rizzo, 1995 WL 1146812, *2 (Mass. Super. Ct. Oct. 13, 1995) ("The mere fact that a bank account can be used in perpetrating a fraud does not mean that banks have a duty to persons other than their own customers."); Commerce Bank/Pa. v. First Union. Nat. Bank., 911 A.2d 133, 140 ("banks do not have a duty to inform other banks of their suspicion of check-kiting activity").

taken a position consistent with this general rule. <u>See</u> <u>Guidry v.</u> <u>Bank of LaPlace</u>, 954 F.2d 278, 286 (5th Cir. 1992) (applying Louisiana law to find that "under normal circumstances a bank owes no duty to those who are not its customers respecting investigation or disclosure concerning its customers"); <u>Red Rock v. Jafco Ltd.</u>, 79 F.3d 1146, 1996 WL 97549, *4 (5th Cir. 1996) (unpublished) (finding that under Texas law a bank owes "no legal duty of care to investigate or disclose its customers' conduct or intent to third parties with whom the bank's customers do business"); <u>Marlin</u> <u>v. Moody Nat. Bank, N.A.</u>, 248 Fed. App'x 534, 540 (5th Cir. 2007) (unpublished) ("a bank owes a duty of care to customers but not third parties").  The rationale behind finding an absence of duty has been explained as follows:

> The banking industry handles a tremendous volume of transactions which involve small, as well as large, sums of money.  To meet the requirements and complexities of our present financial system, the negotiable instrument has emerged as the universal method of insuring the certainty of commercial transactions . . . [W]hen a bank receives a check for deposit which, in all aspects, is valid on its face . . ., that bank has a right to treat the check as it would any other deposit.  To require the bank to investigate the underlying transaction which led to issuance of the instrument or to permit a third person to challenge a depositor's ownership . . . would result in an unreasonable burden upon, and disruption of, regular and normal banking transactions.

<u>Shreveport Prod. Credit Ass'n v. Bank of Commerce</u>, 405 So. 2d 842, 845-46 (La. 1981). <u>See</u> <u>also</u> <u>Eisenberg</u>, 301 F.3d at 226 (citing <u>McCallum</u>, 1995 WL 1146812 at *3 ("to extend a duty of care to [non-

customers] would be contrary to the normal understanding of the purpose of a bank account and would expose banks to unlimited liability for unforeseeable frauds")).

In response, Midwest Feeders attempts to distinguish the class of cases relied upon by Bank of Franklin, noting that even jurisdictions adopting this "universal" rule have carved out exceptions in certain circumstances. See In re Liberty State Benefits, 541 B.R. 219, 251 (Bankr. D. Del. 2015) (noting that banks may owe a duty to non-customers if the bank was on notice of the non-customer's concerns or special needs); Morgan Stanley & Co. Inc. v. JP Morgan Chase Bank, N.A., 645 F. Supp. 2d 248, 256 (S.D.N.Y. 2009) (imposing a duty to foreseeable non-customers where the bank voluntarily allowed non-customers to utilize its "lockbox" facility); Chicago Title v. Allstate Bank, 905 A.2d 366, 378 (M.D. App. 2006) (recognizing a duty of care where there was an intimate nexus between the depository bank and the non-customer through contractual privity or its equivalent); In re McMullen Oil, 251 B.R. 558, 571-72 (Bankr. C.D. Cal. 2000) (depository bank owed a duty of care to payee where the bank accepted checks without the payee's indorsement); Chaney, 595 F.3d at 232 (noting that a bank may be held liable for its customer's misappropriation where "(1) there is a fiduciary relationship between the customer and non-customer, (2) the bank knows or ought to know of the fiduciary relationship, and (3) the bank has actual knowledge or notice that

diversion is to occur or is ongoing"). While Bank of Franklin concedes that courts in other jurisdictions have recognized limited exceptions to the general rule that a bank owes no duty to non-customers, the bank argues that those exceptions are inapplicable here.

The appellate courts in Mississippi have not addressed the duties, if any, which a bank owes to non-customers under facts similar to those in the case sub judice. "When there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide." Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co., 953 F.2d 985, 988 (5th Cir. 1992). This determination is known as an Erie guess, and the Court's task in making such a guess is "to predict state law, not to create or modify it." Keen v. Miller Envtl. Grp., Inc., 702 F.3d 239, 243 (5th Cir. 2012). "In making an Erie guess, [courts] defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise, and [courts] may consult a variety of sources, including the general rule on the issue, decisions from other jurisdictions, and general policy concerns." Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP, 542 F.3d 475, 483 (5th Cir. 2008).

The parties dispute the applicability of three Mississippi cases: Citizens Nat'l Bank v. First Nat'l Bank, 347 So. 2d 964

(Miss. 1977) (holding that in the absence of a fiduciary or confidential relationship, or some other legal duty, a depository bank had no duty to inform a drawee bank that customer was engaged in check kiting scheme), Holifield v. Bancorp South Inc., 891 So. 2d 241 (Miss. Ct. App. 2001) (holding that without actual knowledge,[8] a bank owed no duty to third-party investors to prevent bank customer from using his account in furtherance of fraudulent scheme), and Delta Chem. & Petroleum v. Citizens Bank, 790 So. 2d 862 (Miss. Ct. App. 2001) (discussing a bank's duty owed to non-customer payee when accepting checks with forged indorsements). Though none of these cases are dispositive of the issue, the Court finds that these holdings are instructive insofar as they suggest that the Supreme Court of Mississippi would join a majority of courts by finding that Bank of Franklin owed no duty to Midwest Feeders based on the facts presented. Although Citizens, Holifield, and Delta Chem. & Petroleum allude to certain circumstances under which the Mississippi Supreme Court may take exception to the general rule that banks owe no duty to non-customers, the Court declines to carve out a special exception in this case. See VIP Mortg. Corp, 769 F. Supp. 2d at 27 ("federal

---

[8] "Actual knowledge was defined as 'awareness at the moment of the transaction that the fiduciary is defrauding the principal. It means factual information that the funds are being used for private purposes in violation of the fiduciary relationship.'" Holifield, 891 So. 2d at 249 (quoting Collier v. Trustmark Nat'l Bank, 678 So. 2d 693 (Miss. 1996) (bank could not be negligent in allowing trustee to transfer funds from trust account to trustee's personal account without having actual knowledge of trustee's fraudulent actions)).

courts siting in diversity should be cautious about 'push[ing] state law to new frontiers.'").

Midwest does not dispute that it was not a customer of the Bank or a party to the checks deposited into Rawls' Bank of Franklin account.  Further, Midwest has failed to establish that Bank of Franklin knew that Rawls was violating the terms of a fiduciary relationship that he had or may have had with Midwest. Angela Smith, the branch manager at the bank's Brookhaven location, testified by deposition that although she heard the name "Midwest" in connection with Rawls, she did not know any specifics regarding Rawls' relationship to Midwest. Doc. 383-3, p. 124.  And Darrell Morse, the president of Brookhaven branch, testified that he never heard the name "Midwest Feeders" prior to speaking with his attorneys in relation to the pending suit. Doc. 383-4, p. 92. Midwest produced no evidence that the Bank of Franklin knew the terms of the clearing arrangement entered between Rawls and Midwest Feeders, and there is no evidence that the Bank of Franklin had knowledge that the payees on the subject checks were non-existent and thus beyond the scope of the agreement between Rawls and Midwest.  What's more, Alva State Bank never returned an unpaid check to the Bank of Franklin.  While there is evidence that Bank of Franklin knew Midwest Feeders had a lien on the real property where Rawls' facility was located, and that the bank knew Rawls had an account and line of credit at Alva State Bank, these facts

16

fail to establish that the Bank of Franklin was aware of the arrangement between Midwest Feeders, Rawls, and the Alva State Bank. See Doc. 383-9, p. 62; Doc. 383-75, ¶ 14.

Moreover, Midwest concedes that it monitored its cattle clearing operations utilizing a computer program to access transactions and data. See generally Doc. 383-17; Doc. 383-22; Doc. 383-21. Yet, this scrutiny did not reveal Rawls' fraud until March 2014 when Rawls informed Sternberger that he had written checks to fictional individuals to pay for non-existent cattle, then deposited those checks into the Bank of Franklin. Also, Magee and other bank employees testified that they were unaware of Rawls' fraudulent scheme prior to March 2014, and that testimony is uncontradicted by Midwest Feeders.[9] See Doc. 383-9, pp. 39-52; Doc. 383-2, pp. 72-76; Doc. 383-17, pp. 210, 224. By arguing that the bank should have discovered Rawls' fraud and thus prevented the losses sustained by the plaintiff, Midwest attempts to shield and defend its own lack of care in the monitoring of its cattle clearing business by placing the blame squarely on the Bank of Franklin, which was not in a fiduciary relationship with Midwest Feeders. To expose the Bank of Franklin to liability under these circumstances for undiscovered and unknown fraud to a non-customer

---

[9] Testimony from Jeff Sternberger actually lends support for the bank's proposition that it had no prior knowledge of Rawls' wrongdoings.

would expose the defendant to liability unrecognized under Mississippi law.

Applying the law to the facts, the Court is unpersuaded that the Mississippi Supreme Court would find that the Bank of Franklin owed any duty to Midwest Feeders, a non-customer whose name did not appear on any of the checks at issue, and with which the bank had no relationship. While there is evidence that some of the checks deposited into Rawls' Bank of Franklin account lacked sufficient endorsements, and that accepting unendorsed checks for deposit is generally not within the bounds of reasonable commercial practices, a bank does not assume a duty to non-customers by merely engaging in questionable banking practices or failing to adequately train its employees. Absent any duty owed by the Bank of Franklin, the Court finds that Midwest's negligence based claims fail as a matter of law.

### 3. Civil Conspiracy

A conspiracy under Mississippi law is "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." Gallagher v. Bassett Service, Inc. v. Jeffcoat, 887 So. 2d 777, 786 (Miss. 2004). To establish a civil conspiracy a plaintiff must prove: "(1) an agreement between two or more persons, (2) an unlawful purpose, (3) an overt act in furtherance of the conspiracy, and (4) resulting damages to the plaintiff." Bradley v. Kelly Bros. Contractors, 117 So. 3d 331,

339 (Miss. Ct. App. 2013).[10] "It is imperative that a plaintiff asserting a cause of action for conspiracy prove that the parties had an agreement, either to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully." Gallegos v. Mid-South Mortg. & Inv., Inc., 956 So. 2d 1055, 1060 (Miss. Ct. App. 2007). For conspiracy to arise, "the alleged confederates must be aware of the fraud or wrongful conduct at the beginning of the agreement." Bradley v. Kelly Bros. Contractors, 117 So. 3d 331 (Miss. Ct. App. 2013).

A review of Mississippi case law suggests that courts in this state will not hesitate to render judgment where there is no credible evidence of one or more elements of conspiracy. See Gallagher, 887 So. 2d at 786-87 (Miss. 2004) (finding no evidence of any agreement, open or tacit, between the entities such that a combination of persons was formed for an unlawful purpose); First Nat'l Bank of Iuka v. Alcorn, Inc., 361 So. 2d 481, 494 (Miss. 1978) (the fact that alleged co-conspirator admitted to knowing the bank employee in a business and social manner, coupled with the employee's negligence and wrongful banking transactions, was not sufficient to prove conspiracy); Southern Health Corp. of Houston v. Crausby, 174 So. 3d 916 (Miss. Ct. App. 2015)

---

[10] "While Mississippi has never expressly defined the elements in a conspiracy to defraud suit, we agree that the common elements, generally accepted, are: (1) a conspiracy; (2) an overt act of fraud in furtherance of the conspiracy; and (3) damages to the plaintiff as a result of the fraud." Delta Chem. & Petroleum, 790 So. 2d at 862.

(acquiescence to act does not constitute an agreement to commit an unlawful act); see also Marlin, 248 Fed. App'x at 538 (5th Cir. 2007) (unpublished) (finding no support for conspiracy claims under Texas law where there was no evidence that bank and its manager knew of sham transactions perpetrated by account holder, or that the bank agreed to assist the holder in executing fraud).

Bank of Franklin argues that, despite extensive discovery, Midwest Feeders has produced no credible evidence to show that the bank or any of its agents conspired with Rawls to defraud the plaintiff. In response, Midwest Feeders maintains that the record contains sufficient circumstantial evidence to create a reasonable inference of conspiracy between Rawls and the Bank of Franklin. In support of its position, Midwest Feeders points to the bank's eagerness to obtain Rawls' business, a high uncollected funds balance in Rawls' Bank of Franklin checking account, the bank's approval of wires from Rawls' account when the account was overdrawn by hundreds of thousands of dollars, the bank's acceptance of unendorsed checks for deposit into Rawls' account, and a personal friendship between Rawls and Charles Magee, his account and loan officer at the bank.

Midwest Feeders' conspiracy theory is largely predicated on the close relationship that existed between Rawls and Magee. From the record, it appears that Rawls and Magee were personally acquainted for 30 years, and that Rawls' relationship with the

Bank of Franklin began when Magee invited Rawls to do business with the bank. In 2010, the Bank of Franklin approved two commercial loans for Rawls, both secured by real property, and Rawls opened his checking account with the bank shortly thereafter. When bank executives raised questions about deposited checks and the uncollected funds balance of Rawls' checking account in 2011, Magee, as the account officer, was instructed to obtain more information from Rawls about his account activity.  Based on representations made by Rawls and relayed by Magee, executives at the Bank of Franklin were satisfied that Rawls had legitimate business reasons for his account activity.  While Rawls was a customer of the bank, he and Magee exchanged text messages about personal and business matters, and the two socialized frequently outside of the office.  As the bank officer in charge of overseeing Rawls' accounts, Magee approved multiple wire transfers from Rawls' checking account when there was a negative balance in the account, and also advised a co-worker to refrain from reporting any of Rawls' loans to the credit bureau, waive any late fees, and remove a past due loan payment from the account history.

While it appears that Rawls may have obtained favorable treatment from the Bank of Franklin due to his close relationship with Magee, friendship and preferential treatment, without more, are insufficient to prove the existence of a conspiracy between parties. See Delta Chem. & Petroleum, Inc., 790 So. 2d at 878 ("The

fact that [one party] received some favorable loans and other items of compensation due to their personal relationship with [the other] does not _ipso_ _facto_ create the existence of a conspiracy."); Esmark Apparel, Inc. v. James, 1992 WL 565223 (N.D. Miss. July 6, 1992) (unreported) (an inference of guilt formed solely by association was not an inference sturdy enough to withstand summary judgment on conspiracy claim).  And although conspiracy is often proven through circumstantial evidence and inferences fairly drawn from the behavior of alleged conspirators, "inferences favorable to the plaintiff must be within the range of reasonable probability and it is the duty of the court to withdraw the case from the jury if the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Harris v. Miss. Valley State Univ., 873 So. 2d 970, 981 (Miss. 2004).

The Court finds that the evidence proffered by Midwest Feeders in this case offers no more than speculation and conjecture insufficient to create a genuine issue of material fact as to the conspiracy claim.  Like an unidentified sound in the night, Midwest's argument beckons wild assumptions about hidden schemes skulking beneath a shadow of the facts.  But to accept the conspiracy theory advanced by Midwest Feeders would require the fact-finder to pile inference upon inference, namely that Magee knew of Rawls' fraudulent scheme, that he agreed to conspire with Rawls, and that he acted on behalf of the Bank of Franklin in

furtherance of that agreement.  While the record may suggest a close friendship together with certain waivers allowed by Magee visa vi Rawls, this evidence alone is insufficient to sustain a claim for conspiracy.  Thus, the Court finds that summary judgment is also appropriate on Midwest's conspiracy claim.

### III. Motions to Exclude Expert Testimony

Having found that Bank of Franklin is entitled to summary judgment on all claims stated against it, the Court shall deny Bank of Franklin's pending motions to exclude the expert testimony of Edward Cordes, Cathy Glassman, and John Barthel as moot.

Accordingly,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment **(docket entry 321)** is GRANTED;

IT IS FURTHER ORDERED that Defendant's Motion to Exclude Opinions and Testimony of Edward Cordes **(docket entry 302)** is MOOT;

IT IS FURTHER ORDERED that Defendant's Motion to Exclude Opinions and Testimony of Cathy Glassman **(docket entry 306)** is MOOT;

IT IS FURTHER ORDERED that Defendant's Motion to Exclude Opinions and Testimony of John Barthel **(docket entry 316)** is MOOT.

A Final Judgment dismissing this cause with prejudice shall be entered of even date herewith.

SO ORDERED, this the 18th day of January, 2017.

/s/ David Bramlette
UNITED STATES DISTRICT JUDGE