**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DIVISION**

**MIDWEST FEEDERS, INC.**                                                         **PLAINTIFF**

**VS**                                  **CIVIL ACTION NO.: 5:14cv78DCB-MTP**

**THE BANK OF FRANKLIN**                                              **DEFENDANT**

---

**MEMORANDUM BRIEF IN SUPPORT OF DEFENDANT BANK OF FRANKLIN'S**
**MOTION FOR ATTORNEYS' FEES AND RELATED NONTAXABLE EXPENSES**

---

COMES NOW Defendant Bank of Franklin, by and through counsel, and submits its Memorandum Brief in Support of its Motion for Attorneys' Fees and Related Nontaxable Expenses, which motion is being filed pursuant to F.R.C.P. 54(d)(2), the Mississippi Litigation Accountability Act (Miss. Code Ann. § 11-55-1 et seq.), 28 U.S.C. § 1927 and pursuant to the inherent power of this Court.[1]

## I. FACTS[2]

Midwest Feeders, Inc. (hereinafter "Midwest") filed the instant action against Bank of Franklin (hereinafter "BOF") on September 5, 2014 asserting claims for: 1) conversion of instruments under Miss. Code Ann. § 75-3-420, 2) failure to exercise ordinary care under Miss. Code Ann. § 75-3-404(d), 3) common law conversion of funds, 4) negligence, 5) negligent hiring and supervision and 6) civil conspiracy. (Doc. 1). In this diversity action, the substantive law of the State of Mississippi is applicable. In response to BOF's Motion to Dismiss, this Court

---

[1] Litigation costs which are generally taxable and recoverable by any prevailing party under 28 U.S.C. § 1920 are being requested by separate submission.

[2] The underlying facts and allegations of this case are well-known to the Court and have been thoroughly outlined pursuant to BOF's submissions in support of its Motion for Summary Judgment. (Doc. 321 and Doc. 322). Therefore, only the facts which are pertinent to the instant motion for fees and expenses will be presented in this brief.

dismissed two of Midwest's claims for failure to state a claim, including the claim for conversion of instruments under Miss. Code Ann. § 75-3-420 and common law conversion of funds, by Order dated July 7, 2015. (Doc. 33).

In its July 7, 2015 Order, this Court noted that, in considering BOF's Motion to Dismiss, it was required to consider the facts asserted in Midwest's Complaint to be "accepted as true" when determining if the claims asserted were plausible. (Doc. 33 at 3, *quoting Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). It was through this lens which the Court viewed Midwest's allegations when considering the Motion to Dismiss. Importantly, the Court did find that "Bank of Franklin took facially valid checks from Rawls." (Doc. 33 at 9). However, the Court also found Midwest's allegation that BOF failed to examine these facially valid checks, thereby allegedly breaching reasonable commercial standards prevailing in the area in which BOF is located, needed "further factual development" (Doc. 33 at 9-10).[3] Therefore, the claim for failure to exercise ordinary care under Miss. Code Ann. § 75-3-404(d) was allowed to proceed to discovery.

With regard to Midwest's claims for common law negligence and negligent hiring and supervision, this Court, in its Order on BOF's Motion to Dismiss, noted BOF's argument that banks owe no common law duty of care to non-customers. While the Court took note of the lack of any authority from the Supreme Court of Mississippi directly addressing the issue, perhaps necessitating an *Erie* guess, it also recognized "[t]he almost-universal law in this country is that banks owe a duty of care only to their customers." (Doc. 33 at 11). Implicit in the

---

[3] Notably, Midwest never designated an expert qualified to testify as to reasonable commercial standards for a community bank in South Mississippi. (See BOF's Motion to Exclude Opinions and Testimony of Cathy C. Glassman (Doc. 306) and supporting brief (Doc. 307). As a result, had this matter gone to trial, Midwest would have failed to obtain qualified expert testimony on this crucial issue.

Court's opinion was the lack of any Mississippi authority which would recognize any duty to Midwest under the facts at issue. The Court went on to cite to several authorities espousing this "almost-universal" law and the reasons therefore--authorities which the Court referred to as "persuasive". (Doc. 33 at 12). Nevertheless, the Court declined to make an *Erie* guess at the Motion to Dismiss stage of the litigation, finding that doing so would be premature. The Court, therefore, allowed the claims for common law negligence and negligent hiring and supervision to proceed to discovery.

With regard to Midwest's claim for civil conspiracy, this Court found "that the *circumstantial* evidence alleged by Midwest Feeders is sufficient to create a *factual inquiry* regarding a civil conspiracy." (Doc. 33 at 19) (Emphasis added). Of course, as noted previously, this Court was compelled to accept the facts presented by Midwest as true for purposes of considering the Motion to Dismiss. The Court, noting that a conspiracy claim must be based on an underlying tort (Doc. 33 at 15), found that Midwest "may rely on its assertion of Rawls' fraud to satisfy its pleading requirement." (Doc.33 at 18). Discovery was, therefore, allowed to proceed on the civil conspiracy claim as well.

Following the Court's ruling on BOF's Motion to Dismiss, counsel for BOF wrote counsel for Midwest on September 25, 2015 formally requesting that Midwest dismiss its claims. (See September 25, 2015 correspondence from Matt Quinlivan, Esq. to James Franklin Noble, III, Esq., Scott C. Sandberg, Esq., Timothy G. O'Neill, Esq., John O'Brien, Esq. and Neal McConomy, Esq., Exhibit A to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.)[4] In said correspondence, Mr. Quinlivan noted Midwest's obligation to investigate its claims and

---

[4] Unless otherwise stated, all exhibit references herein refer to the exhibits attached to BOF's Motion for Attorneys' Fees and Related Nontaxable Expenses.

allegations before initiating a legal action as well as its continuing duty to evaluate the merits of its claims as litigation proceeds. Mr. Quinlivan attached a copy of this Court's Order Granting in Part and Denying in Part Motion to Dismiss and noted the Court's recognition of the general rule that banks do not owe a duty of care to non-customers. Said correspondence asserted that Midwest's claims were "both legally and factually meritless" and cited Miss. Code Ann. § 11-55-1 (the Mississippi Litigation Accountability Act) in stating that BOF would seek recovery of its fees and expenses if the claims were not dismissed with prejudice. Notwithstanding BOF's offer to waive any request for fees or expenses if Midwest agreed to voluntarily dismiss its claims, Midwest failed to dismiss any claims at all.

On May 25, 2016, BOF's counsel again wrote to Midwest's counsel demanding that Midwest dismiss all claims against BOF, noting the continuing duty of Midwest and its counsel "to identify and dismiss claims which do not have a basis in fact and/or law." (See May 25, 2016 correspondence from Matt Quinlivan, Esq. to Midwest's counsel, attached as Exhibit B to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.) Mr. Quinlivan cited 28 U.S.C. § 1920, 28 U.S.C. § 1927, FRCP 11, and the Mississippi Litigation Accountability Act (Miss. Code Ann. § 11-55-1 et. seq). The May 25, 2016 correspondence demanding dismissal cited additional developments since the September 25, 2015 correspondence had been sent, including: 1) the fact Midwest's expert, Cathy Glassman, had submitted an opinion based on assumptions which had no factual basis, 2) the fact Midwest's expert, Edward Cordes, submitted an opinion without the benefit of any factual basis concerning ordinary care and containing findings which were "not consistent with the documents available from Alva State Bank", 3) the fact Midwest was in the best position to discover any alleged fraud by Rawls,

failed to act on its own knowledge regarding Rawls actions and failed to follow or enforce its own contractual agreements with Rawls; 4) the fact there still was no proof or showing that BOF owed Midwest a legal duty as it was not a customer of BOF, and 5) the fact Midwest, in response to interrogatories, had been unable to offer any specific facts supporting its civil conspiracy claim, notwithstanding having conducted multiple depositions in related litigation-- depositions which showed no facts or proof that would implicate BOF in a conspiracy. BOF again demanded that Midwest dismiss all claims with prejudice, noting "Bank of Franklin continues to improperly incur costs to defend the four claims Midwest Feeders, Inc. is advocating"—claims which Bank of Franklin contended were "baseless, have no hope of success, and are without substantial justification to proceed." Again, Midwest failed to dismiss any of its claims.

As a result of Midwest's refusal to dismiss its claims, BOF was forced to engage in extensive discovery. Forty depositions were taken in this action in Mississippi, Louisiana, Kansas, Oklahoma, North Carolina, Georgia and Colorado. BOF produced 46,374 pages of documents; Midwest produced 86,585 pages of documents; BOF has received 40,127 pages of documents from non-parties by subpoena and Midwest subpoenaed 1,141 pages of documents from non-parties. Said documents do not include 78,746 pages of Viewtrack documents and transactions produced and thousands of pages of additional documents made available to BOF very late in the litigation process. This excruciating and costly discovery was necessitated by Midwest's refusal to dismiss its claims when it became clear there was no legal or factual basis to support those claims.

Following discovery, and there still being no evidence to support Midwest's claims, BOF's counsel made yet another attempt to obtain Midwest's dismissal of its claims by correspondence dated September 19, 2016. (See September 19, 2016 correspondence attached as Exhibit C to Affidavit of Matt Quinlivan, Esq., attached to the Motion as Exhibit 4.) In said correspondence, BOF's counsel incorporated by reference the pertinent information contained in the two prior letters it had sent to counsel for Midwest. Mr. Quinlivan also directed Midwest's counsel to the contents of the Motion for Summary Judgment and Memorandum Brief in Support of Motion for Summary Judgment which BOF had filed by that time. He also pointed out that, in addition to the grounds for dismissal previously stated in prior correspondence related to the various claims, Midwest had offered no facts or witnesses to establish a genuine issue of material fact on the civil conspiracy claim even after all discovery had been conducted. Mr. Quinlivan noted that "Midwest's losses were the result of its relationship with Rawls" and "Midwest's actions resulted in its alleged loss". BOF also noted Midwest's continuing duty to review "each individual claim to determine whether it could prevail on each claim" and that BOF continued to incur sizable attorneys' fees due to Midwest's failure to do so. BOF again demanded all claims be dismissed, and Midwest again failed to dismiss any or all of its claims in response.

Following Midwest's failure to voluntarily dismiss its remaining claims—claims which still had no factual or legal support after extensive discovery—BOF began preparing for trial, which at that time was scheduled to commence on February 6, 2017. Then, on January 18, 2017, this Court entered its Memorandum Opinion and Order granting BOF's Motion for Summary Judgment on all claims. (Doc. 394). In that Memorandum Opinion and Order, the

Court confirmed what BOF had been telling Midwest all along—that there was no legal or factual basis for Midwest's remaining claims, there was no genuine issue of material fact and BOF was entitled to judgment as a matter of law. This Court noted that "[i]n determining whether there is a genuine dispute as to any material fact, the Court considers all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." (Doc. 394 at 5). "The Court views the evidence and draws reasonable inferences in the light most favorable to the nonmovant . . . . But in the absence of any proof, the Court will not assume that the nonmoving party could or would prove the necessary facts." (Doc. 394 at 6). Even considering the Motion for Summary Judgment in the light most favorable to Midwest, the Court found there was no proof to support any of Midwest's remaining claims.

With regard to the claim for failure to use ordinary care under Miss. Code Ann. §75-3-404(d), the Court found that Midwest "cannot qualify as a 'person entitled to enforce' the checks deposited into Rawls' Bank of Franklin account. Midwest was not a party to any of the instruments—it was not the payee or the drawer on the checks, and Midwest never possessed any of the checks at issue." (Doc. 394 at 8). BOF's counsel, in the September 19, 2016 correspondence to Midwest's counsel requesting dismissal, had specifically stated, "[s]ince Midwest Feeders, Inc., was not a party to the 891 checks, it is not entitled to the remedies codified at Miss. Code Ann. §75-3-404(d)." (See correspondence attached as Exhibit C to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.) This Court agreed and granted summary judgment on this claim.

With regard to Midwest's claims for common law negligence and negligent hiring and supervision, this Court made an *Erie* guess that the Supreme Court of Mississippi would follow

the "almost-universal rule" that banks owe no duty to third party non-customers, just as it signaled it would in describing the precedents supporting that rule as "persuasive" when ruling on BOF's Motion to Dismiss. (Doc. 33 at 12). In so doing, the Court considered Mississippi case law submitted by BOF, finding "that these holdings are instructive insofar as they suggest the Supreme Court of Mississippi would join a majority of courts by finding that Bank of Franklin owed no duty to Midwest Feeders based on the facts presented." (Doc. 394 at 15). As early as its September 25, 2015 correspondence to Midwest's counsel, BOF's counsel stated in requesting dismissal, "[y]our client's entire case hinges upon the assumption(s) that BOF owed it a legal duty and that BOF caused Midwest damages. The Court's Order Granting in Part and Denying in Part Motion to Dismiss expressly states there is no such legal duty recognized by Mississippi law." (See September 25, 2015 correspondence attached as Exhibit A to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.) Yet Midwest refused to dismiss this claim, causing BOF to incur more expense in mounting a defense to the claim.

Also with regard to the negligence claims, the Court found "Midwest has failed to establish that Bank of Franklin knew that Rawls was violating the terms of a fiduciary relationship that he had or may have had with Midwest." (Doc. 394 at 16). Furthermore, "Midwest produced no evidence that the Bank of Franklin knew the terms of the clearing arrangement entered into between Rawls and Midwest Feeders, and there is no evidence that the Bank of Franklin had knowledge that the payees on the subject checks were non-existent and thus beyond the scope of the agreement between Rawls and Midwest. What's more, Alva State Bank never returned an unpaid check to the Bank of Franklin." (Doc. 394 at 16). This Court also recognized that testimony from Jeff Sternberger, Midwest's President, "actually lends

support for the bank's proposition that it had no prior knowledge of Rawls' wrongdoings." (Doc. 394 at 17, n. 9).

When BOF briefed its Motion for Summary Judgment, it presented testimony uncovered during discovery that Midwest did not avail itself of the many mechanisms it had in place to detect fraud such as that allegedly undertaken by Rawls and did not enforce its own agreements with Rawls which were designed to prevent predicaments such as that in which Midwest ultimately found itself. (See BOF's Memorandum in Support of Motion for Summary Judgment, Doc. 322.) This Court agreed when it stated "Midwest concedes it monitored its cattle clearing operations utilizing a computer program to access transactions and dates. . . . Yet this scrutiny did not reveal Rawls' fraud until March 2014 when Rawls informed Sternberger that he had written fictional checks to fictional individuals to pay for non-existent cattle . . . " (Doc. 394 at 17). This Court added, "By arguing that the bank should have discovered Rawls' fraud and thus prevented the losses sustained by the plaintiff, Midwest attempts to shield and defend *its own lack of care* in the monitoring of its cattle clearing business by placing the blame squarely on the Bank of Franklin, *which was not in a fiduciary relationship with Midwest Feeders*." (Doc. 394 at 17) (Emphasis added.) The Court concluded that "[t]o expose the Bank of Franklin to liability under these circumstances for undiscovered and unknown fraud to a non-customer would expose the defendant to liability *unrecognized under Mississippi law*." (Doc. 394 at p. 18) (Emphasis added).[5]

---

[5] BOF was not the only victim of Midwest's attempts to deflect responsibility for its own lack of care. The District Court for the Middle District of Georgia dismissed virtually identical claims brought by Midwest against Regions Bank on September 30, 2016. *Midwest Feeders, Inc. v. Regions Bank (Inc.) (Ala.),* Case No. 1:15-cv-00013, Doc. 21 at 3-4 (M.D. Ga. September 30, 2016). See also *Midwest Feeders, Inc. v. First State Bank of Blakely,* Case No. 1:15-cv-00014-LJA (M.D. Ga.)

Notably, in the May 25, 2016 correspondence to Midwest's counsel requesting dismissal of its claims (the second of three such letters), counsel for BOF stated "Midwest Feeders, Inc. was in the best position to discover any alleged fraud by Robert Rawls. Continued investigation by you of the facts should have already revealed that Jeff Sternberger was aware of Rawls allegedly deficient action; Midwest Feeders, Inc. failed to account for its financed cattle and had deficient internal controls with Robert Rawls; prior to 2010, Robert Rawls used his State Bank & Trust account to engage in many of the same transactions which Midwest Feeders now complains of in this lawsuit; and Midwest Feeders, Inc. quotidianly loaned Robert Rawls money in gross excess of the limits of the 2006 promissory note and its filed Deed of Trust." (See correspondence attached as Exhibit B to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.)

In granting summary judgment on Midwest's claim for civil conspiracy, this Court found "that the evidence proffered by Midwest Feeders in this case offers no more than speculation and conjecture insufficient to create a genuine issue of material fact as to the conspiracy claim." (Doc. 394 at 22). The Court added, "[l]ike an unidentified sound in the night, Midwest's argument beckons wild assumptions about hidden schemes skulking beneath a shadow of facts" and that to accept Midwest's theory "would require the fact-finder to pile inference upon inference . . . " (Doc. 394 at 22). Midwest wholly failed to produce any facts which would justify allowing a fact-finder to consider its claim.

All of BOF's requests for dismissal of the unsubstantiated claims and statements of its intention to seek fees and expenses went unheeded. As a result, BOF was forced to engage in Midwest's fishing expedition—an extremely expensive fishing expedition that required review

of thousands of financial transactions and banking records (not only from BOF, but also from the banks involved in the relationship between Midwest and Rawls, *i.e.,* Alva State Bank and Bank of the West); thousands of cattle transactions; tens of thousands of pages of documents; depositions necessarily taken all over the country; and retention of costly banking, accounting and cattle experts. BOF had no choice but to diligently defend itself as Midwest was aggressively seeking recovery of $30,000,000.00 in damages in this action, an amount which would have driven BOF out of business. Midwest's claims were unsupported by fact or law at all stages of this litigation--when they were filed, during discovery and even following completion of discovery, were frivolous and were at all times without substantial justification. Accordingly, BOF moves this Court for its fees and expenses under the authorities discussed below.

## II.  MISSISSIPPI LITIGATION ACCOUNTABILITY ACT

This case is a diversity action in which the court has determined to apply the substantive law of the State of Mississippi. (Doc. 33 at 3). Federal courts have generally applied the Mississippi Litigation Accountability Act, Miss. Code Ann. § 11-55-1 et seq., to cases brought in federal court, particularly in, but not limited to, diversity cases. *See, e.g., Wolfe v. LABMD, Inc.,* 483 F. App'x 893 (5th Cir. 2012) (Fifth Circuit upheld award of attorney fees by the District Court for the Northern District of Mississippi under Mississippi's Litigation Accountability Act in action filed in federal district court "without substantial justification"); *Alradai v. Riverhills Bank,* 2007 WL 2001647 (S.D. Miss. 2007) (in suit brought in federal court, this Court considered award of fees under Mississippi Litigation Accountability Act, stating "[t]his Court is aware of several cases from the Southern and Northern Districts of Mississippi that have applied the Mississippi Litigation Accountability Act ("MLAA") in diversity actions"); *Vazzana v. City of Greenville*, 2007

WL 465634 (N.D. Miss. 2007) (district court awarded fees under Mississippi Litigation Accountability Act where claim brought in federal court lacked substantial justification).

The Mississippi Litigation Accountability Act, at Miss. Code Ann. § 11-55-5, states:

(1)  Accept as otherwise provided in this chapter, in any civil action commenced or appealed in any court of record in this state, the court **shall** award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney's fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action, or asserted any claim or defense, that is ***without substantial justification***, or that the action, or any claim or defense asserted, was ***interposed for delay or harassment***, or if it finds that an attorney or party ***unnecessarily expanded the proceedings by other improper conduct***, including, but not limited to, abuse of discovery procedures available under the Mississippi Rules of Civil Procedure.

(2)  No attorney's fees or costs shall be assessed if a voluntary dismissal is filed as to any action, claim or defense within a reasonable time after the attorney or party filing the action, claim or defense knows or reasonably should have known that it would not prevail on the action, claim or defense.

(3)  When a court determines reasonable attorney's fees or costs should be assessed, it shall assess the payment ***against the offending attorneys or parties, or both,*** and its discretion may allocate the payment among them, as it determines most just, and may assess the full amount or any portion to any offending attorney or party.

(Emphasis added.) Miss. Code Ann. § 11-55-3 defines "without substantial justification" to mean the action, claim, defense, appeal or motion "is frivolous, groundless in fact or in law, or vexatious as determined by the court."

The Mississippi Litigation Accountability Act, at Miss. Code Ann. § 11-55-7, also states:

In determining the amount of an award of costs or attorney's fees, the court shall specifically set forth the reasons for such award and shall consider the following factors, among others, in determining whether to assess attorney's fees and costs and the amount to be assessed:

(a)  The extent to which any effort was made to determine the validity of any action, claim or defense before it was asserted, and the time remaining within which the claim or defense could be filed;

(b)   The extent of any effort made after the commencement of an action to reduce the number of claims being asserted or to dismiss claims that have been found not to be valid;

(c)   The availability of facts to assist in determining the validity of an action, claim or defense;

(d)   Whether or not the action was prosecuted or defended, in whole or in part, in bad faith or for an improper purpose;

(e)   Whether or not issues of fact, determinative of the validity of a party's claim or defense, were reasonably in conflict;

(f)   The extent to which the party prevailed with respect to the amount of and number of claims or defenses in controversy;

(g)   The extent to which any action, claim or defense was asserted by an attorney or party in a good faith attempt to establish a new theory of law in the state, which purpose was made known to the court at the time of filing;

(h)   The amount or conditions of any offer of judgment or settlement in relation to the amount of the ultimate relief granted by the court;

(i)   The extent to which a reasonable effort was made to determine prior to the time of filing of an action or claim that all parties sued or joined were proper parties ***owing a legal duty*** to any party or parties asserting the claim or action;

(j)   The extent of any effort made after the commencement of an action to reduce the number of parties in the action; and

(k)   The period of time available to the attorney for the party asserting any defense before such defense was interposed.

(Emphasis added.)

Midwest's duty to assess its claims at each stage of the litigation is clear from the statute as well as the case law. *See, e.g., Leaf River Forest Products, Inc. v. Deakle*, 661 So. 2d 188, 197 (Miss. 1995) ("the Act imposes a duty of continuing inquiry, allowing sanctions where an action, claim or defense is not voluntarily dismissed within a reasonable time after the

attorney or party responsible for the claim knows or reasonably should have known that he could not prevail on the claim"). BOF reminded Midwest of this continuing duty in correspondence requesting dismissal throughout the litigation, as set forth in Section I of this brief.

A close review of the 11 factors to be considered in awarding fees and costs under the Mississippi Litigation Accountability Act, as set forth in § 11-55-7, indicates this is a text book example of the type of case the Act addresses, as each of those factors weighs against Midwest and in favor of awarding attorneys' fees and costs to BOF. See *Wolfe v.* Rayford, 2010 WL 481059 at*2 (N.D. Miss. 2010) ("Even if the Wolfes originally had a sufficient belief LabMD was liable by January 26 they were well aware no legitimate claim existed. LabMD's requests to be dismissed from the suit were rejected despite this knowledge. This is the type of situation contemplated by the MLAA."); *Vazzana v. City of* Greenville, 2007 WL 465634 at *4 (N.D. Miss. 2007) ("It is also indisputable that Vazzana made no attempt to dismiss any of the claims asserted in his complaint or to reduce the number of parties in the action. His failure to do so, despite numerous requests by the defendants to that effect, is indicative of purposeful harassment.")

There was never any legal or factual basis for any of Midwest's claims and they were wholly "without substantial justification" as explained by this Court in its Memorandum Opinion and Order granting summary judgment. (Doc. 394). As this Court found, Midwest never had legal standing to assert a claim under Miss. Code Ann. § 75-3-404(d) as it was not a party to the checks at issue; nor did it have an interest in the checks. Likewise, with regard to the claims for common law negligence and negligent hiring and supervision, Midwest was owed no legal duty

by BOF (see subsection (i) of § 11-55-7 quoted above), as Midwest was a third-party non-customer. With regard to Midwest's claim for civil conspiracy, while the court was compelled to assume the facts plead by Midwest were true in ruling on BOF's Motion to Dismiss, those facts turned out not to be true or credible, as this Court noted. They were nothing more than speculation and innuendo, or as the Court put it "wild assumptions" (Doc. 394 at 22) wholly unsupported by any testimony throughout discovery.

This case never involved a conflict in the facts (see subparagraph (e) of § 11-55-7, *supra*), but was filed by a party which ***knew*** from day one there were no facts to suggest that BOF knew of Rawls' alleged fraud or to suggest any agreement or conspiracy with Rawls on the part of BOF. Testimony by Plaintiff and its agents clearly demonstrates Midwest admittedly NEVER knew of any evidence which would support its conspiracy claim and that testimony bears repeating here. In Midwest Feeders' 30(b)(6) deposition, designee Jeff Sternberger, President and controlling shareholder of Midwest, admitted there was no witness testifying that BOF was involved in a conspiracy with Rawls, as follows:

> Q. Okay. Have you heard any witness in this case state that the Bank of Franklin was involved in a conspiracy with Robert Rawls?
>
> A. I've heard no formal testimony to that.

(Midwest Dep. at 20, Exhibit 5 to Motion).

> Q. (By Ms. Burnthorn) Other than—you admit that there's no witness who has made a direct statement to you that Bank of Franklin was involved in a conspiracy with Robert Rawls, right?
>
> A. Right.
> . . .

> Q. And you don't have anybody that you went out and interviewed independently. You said that either, right?
>
> A. Not to my knowledge.

(Midwest Dep. at 22, Exhibit 5 to Motion).

Plaintiff's claim of conspiracy against BOF generally revolved around allegations that the loan officer who serviced Rawls' loan, Charlie Magee, was somehow complicit or otherwise involved in Rawls' alleged scheme. However, Sternberger's testimony in his individual deposition belied such suggestions of involvement on Mr. Magee's part, when he stated:

> Q. Is there anything that Mr. Charlie Magee did or said at any time in March 2014 that indicated to you one way or another whether he was aware that Robert Rawls had committed fraud?
>
> A. No.
>
> Q. Did Charlie Magee—what do you recall about your conversation with Mr. Magee on March 17, whether it was by phone or in person?
>
> A. There was some discussion as to both of us were surprised he had shut the operation down. We didn't realize that he was operating at a loss and, you know, indicated that Rawls was not in a very good frame of mind or medical or psychologically stable.

(Sternberger Dep. at 210, Exhibit 6 to Motion). Likewise, Sternberger admitted Rawls, while supposedly confessing to fraud, said nothing to indicate Charlie Magee or anyone else at BOF were involved in any way with his actions, as follows:

> Q. Did Mr. Rawls on March 18 or at any time say anything to you that would implicate in any way Mr. Charlie Magee or anybody else at the Bank of Franklin as being aware of what he was doing?
>
> A. No.

(Sternberger Dep. at 220, Exhibit 6 to Motion). In fact, Charlie Magee's shock at learning of

Rawls' alleged fraud was evident to Sternberger, who testified as follows:

> Q.     Okay. What did you tell Mr. Charlie Magee?
>
> A.     He asked me about the conversation with Rawls, and I told Charlie what Rawls had told me, and I also showed him the fraudulently—the checks that were made out fraudulently with the forged endorsements that were ran through Bank of Franklin and the invoices and—yeah.
>
> Q.     So it sounds like you displayed to Mr. Charlie Magee all of the documents that Mr. Rawls had handed to you, including the fake checks and the fake invoices. Is that true?
>
> A.     I showed him the stacks and explained what they were, and Charlie was—I thought he was going to faint. He was very shocked.

(Sternberger Dep. at 223-224, Exhibit 6 to Motion).

This lawsuit had no "substantial justification"; instead, this case was brought for an improper purpose. Midwest, having allegedly been defrauded by more than one of its customers due to its lack of care in monitoring its own cattle clearing operation, set about suing banks, including BOF, without any justification in an attempt to recoup its losses. As noted herein, another virtually identical case was dismissed by the District Court for the Middle District of Georgia before this Court's award of summary judgment in the instant case. (See n. 5, *supra.*) BOF should not be left to bear the costs of Midwest's abuse of the legal system.

### III.     28 U.S.C. § 1927

In addition to the Litigation Accountability Act, BOF is entitled to relief

under 28 U.S.C. § 1927. That statute reads as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct.

Unlike the Mississippi Litigation Accountability Act, under which fees and costs may be awarded against both the party and/or its attorneys, § 1927 is limited strictly to attorney conduct. It is clear that pursuit of a meritless claim can lead to sanctions under § 1927 since such conduct clearly multiplies the proceedings. See *Walker v. City of Bogalusa*, 168 F.3d 237, 240 (5th Cir. 1999) (considering sanctions under § 1927 court stated "[a] district court may sanction an attorney who engages in 'the persistent prosecution of a meritless claim'"); *Shaver v. Shaver,* 2007 WL 312705 at *8 (S.D. Miss. 2009) (bad faith under § 1927 "is found where 'claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment'"). However, the actions of Midwest's counsel go beyond merely pursuing a meritless claim with persistence.

Throughout this litigation, Midwest's counsel engaged in a scorched earth policy of sending numerous communications to BOF's counsel clearly designed to intimidate, terrorize and harass BOF, its directors and shareholders into paying an exorbitant ransom to free themselves of Midwest's meritless claims and threats. While BOF readily concedes that a certain amount of posturing and even occasional threats are to be expected in litigation, the actions of Midwest's counsel crossed the line of appropriate attorney behavior and into the realm of extortion. This course of conduct began as early as July 9, 2015, when John O'Brien,

Esq., one of Midwest's attorneys, sent correspondence to counsel for Midwest proposing "a structure for resolving Midwest's claims in light of the regulatory and financial constraints imposed upon Bank of Franklin." (See July 9, 2015 correspondence attached as Exhibit E to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.)[6] In that correspondence, Mr. O'Brien laid out research he had conducted on BOF's assets, concluded that those assets would be insufficient to satisfy the judgment Midwest expected to obtain and explained BOF was "in the vicinity of insolvency and will need to close or be sold." He added that "[a] sale cannot close with any buyer without Midwest's consent or resolution of Midwest's claim. And it is unlikely a buyer will be found in light of Bank of Franklin's systemic internal managerial and operational deficiencies."

Mr. O'Brien proceeded to note BOF was not eligible for relief under the Bankruptcy Code and insisted that BOF must "report its current position to its regulators and fully cooperate in all investigations surrounding Midwest's claim even if means that the Bank and its officers must engage separate legal counsel for this purpose." He insisted that "stock dividends must cease" and claimed that any dividends paid would be "subject to disgorgement under federal and state preference and fraudulent conveyance statutes."

After explaining its dire circumstances to BOF, Mr. O'Brien offered resolution of Midwest's claim upon the following terms: 1) full payment of BOF's insurance policy limits, 2)

---

[6] Mr. O'Brien's purported settlement offer is entitled "Rule 408 Communication", which under normal circumstances would not be admissible under F.R.E. 408. However, BOF does not submit this correspondence to the Court, or any of the other similar communications discussed in this brief, for the purpose of proving or disproving "the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or contradiction". Rule 408 clearly states this Court may consider such communications for other purposes—in this case—to consider conduct of counsel. Furthermore, Miss. Code Ann. § 11-55-7(h) lists as one of the factors to be considered by the Court in ruling on a motion for fees and expenses "[t]he amount or conditions of any offer of judgment or settlement in relation to the amount or conditions of the ultimate relief granted by the court." Therefore, such communications are pertinent to this Court's analysis pursuant to the instant motion.

the transfer of all BOF stock to a special purpose entity to be formed by Midwest, with the exception of shares owned by any existing KSOP, and 3) no further stock dividends to be paid by current ownership on or after the date of his letter and any dividends that were paid would be returned to Midwest's special purpose entity. Mr. O'Brien was even gracious enough to offer severance pay to the bank's current employees (4 months severance for officers and 6 months for non-officers.) This letter was only the first of many such "settlement offers" to come from Midwest throughout the litigation. On the same day Mr. O'Brien sent his July 9, 2015 correspondence, he emailed all of BOF's counsel asking them to "please advise which bank officers and employees have already engaged separate counsel" and to provide said counsel's contact information. (See email correspondence attached as Exhibit F to Affidavit of Matt Quinlivan, attached to Motion as Exhibit 4.)

Later, in response to BOF's September 25, 2015 correspondence requesting that Midwest dismiss its claims, Mr. O'Brien responded by correspondence dated September 28, 2015. (See September 28, 2015 correspondence attached as Exhibit G to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.) Mr. O'Brien's correspondence started by saying "[u]nfortunately for the employee class it appears Bank of Franklin is not realistically evaluating the circumstances present here. Personal attacks and threats upon Midwest and its professionals do not enhance Bank of Franklin's position." He then proceeded to make another settlement offer similar to his first, but this time he demanded all shares of BOF stock with the exception of only 50% of shares owned by employees and any currently existing K-SOP, if any, not to exceed a total of 10% of all outstanding shares. In addition, he had reduced severance for officers to only 2 months pay in his new offer. He closed his correspondence by

again presuming individual employees and shareholders had retained their own separate counsel to protect their rights and requesting the identity of such counsel.

The egregious campaign of intimidation continued, when on June 1, 2016, Scott Sandberg, Esq., another of Midwest's attorneys, emailed all counsel for BOF stating, "[w]e believe it is customary and appropriate to inform us in advance of any depositions in which BOF officers and employees intend to assert their rights under the Fifth Amendment, and the topics on which they will assert those rights. This will result in more expeditious and efficient depositions"—a clear suggestion that BOF officers and employees had committed some criminal act. (See June 1, 2016 email attached as Exhibit H to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.) Incidentally, no BOF officers or employees invoked the Fifth Amendment at any point in their depositions, as they had no reason to. John O'Brien, apparently disappointed by this development, sent another letter to counsel for BOF on July 12, 2016, stating "[t]he Bank of Franklin witnesses did not invoke their rights under the Fifth Amendment at their depositions. Accordingly, Midwest Feeders will resist any motion to continue the trial date in the event any such witnesses later elect to invoke their rights under the Fifth Amendment in this *or any other proceeding*"—a not-so-subtle suggestion that the bank's employees and officers might be compelled to testify in some proceeding other than the instant action. (See July 12, 2016 correspondence attached as Exhibit I to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.)(Emphasis added.) BOF never found it necessary to request a continuance of the trial date.

Apparently still stinging from the fact that no bank employee or officer had either invoked their Fifth Amendment rights or hired their own independent counsel, John O'Brien

followed up only two days later, on July 14, 2016, with yet another of his Orwellian proposals for resolution of Midwest's claims. (See July 14, 2016 correspondence attached as Exhibit J to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.) This latest correspondence started out by stating the bank's board of directors "knows or should know that the most likely outcome in this case is the Bank will incur a judgment and obligation beyond its modest means to pay after taking into account available insurance. Once Judgment is entered Midwest will garnish the Bank's account at the Fed and will garnish customer loan payments."

Mr. O'Brien then proceeded to lay out an even more dire scenario than he had before, including the bank being taken over by the FDIC, shareholders being "wiped out", scrutiny from the FDIC of the bank's board and professionals, remedial orders, claims against directors and shareholders. He added that "[a] modest recovery for existing shareholders is better than a complete wipeout and the shareholder and creditor litigation that will ensue against Bank directors and other individuals." Mr. O'Brien then informed BOF's counsel to "[p]lease advise counsel for the employee shareholder class that their preferred opportunity is no longer available", even though there was no such attorney.

He concluded by proposing two optional settlements, both equally draconian and both involving the destruction of BOF. The first option would result in Midwest owning 95% of a newly formed entity with current shareholders owning only 5%. The second option would involve the Bank's holding company issuing an $18M debenture in favor of Midwest. Mr. O'Brien emphasized the decision as to which option would occur would be Midwest's choice, and not the choice of BOF. In yet another threat, Mr. O'Brien stated the general release BOF would receive would "carve out ***criminal*** restitution and civil forfeiture recoveries" (Emphasis

added). Despite the lack of foundation for any of Midwest's demands, BOF took these threats very seriously. The bank was fighting for its very existence against Midwest's frivolous lawsuit and its attorneys' harassment.

Only a few days after threatening criminal charges against BOF, on July 18, 2016, John O'Brien wrote BOF's counsel asking BOF to authorize Midwest to disclose confidential documents covered by the Stipulated Protective Order to "law enforcement, the Packers and Stockyards Administration and any other governmental regulatory unit, to include the FDIC, the OCC and the Mississippi Department of Banking And Consumer Finance." (See July 18, 2016 correspondence, attached as Exhibit K to Affidavit of Matt Quinlivan, attached to Motion as Exhibit 4.) This letter was a clear threat made by Midwest to stir up frivolous criminal or regulatory investigations in order to obtain leverage in its efforts to settle this civil action. This not-so-veiled threat was made despite the fact Midwest's attorneys knew they had no well-founded belief that criminal or administrative charges against BOF were warranted by the facts or the law. Additionally, Rule 8.4(e) of the Mississippi Rules of Professional Conduct states that "[i]t is professional misconduct for a lawyer to: . . . (e) state or imply an ability to influence improperly a government agency or official  or to achieve results by means that violate the Rules of Professional Conduct or other law."

Needless to say, BOF refused Midwest's request. (See July 20, 2016 correspondence from Matt Quinlivan, Esq. to John O'Brien, Esq., attached as Exhibit D to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.) Mr. O'Brien responded by email dated July 21, 2016 stating "it is quite unusual for a regulated financial institution to take a position obstructing criminal and regulatory investigation." (See July 21, 2016 email attached as

Exhibit L to Affidavit of Matt Quinlivan, Esq., attached to Motion as Exhibit 4.) Mr. O'Brien also stated that if BOF would not agree to modification of the Stipulated Protective Order, Midwest would file a motion requesting the Court to modify it. Despite BOF's continuing refusal, Midwest never did file such a motion, apparently because the threats to stir up criminal and/or regulatory proceedings against BOF and its employees were nothing more than an effort by Midwest's counsel to intimidate BOF into turning over all of its stock and assets to Midwest.

The communications from Midwest's counsel outlined above go beyond appropriate settlement negotiation and, in fact, cross the boundaries within which licensed attorneys are allowed to represent their clients. To refer to such conduct as vexatious would be an understatement. Midwest's attorneys filed a lawsuit against BOF which they knew was not substantiated by law or fact and then proceeded to threaten instigation of a myriad of criminal and regulatory investigations and charges against BOF in order to extort BOF's shareholders out of their stock. And this was all undertaken so their client could recoup losses which resulted from Midwest's own failings in monitoring its cattle clearing operation.

## IV. THE INHERENT POWER OF THIS COURT

In addition to the authorities discussed above, it is well recognized that courts have the inherent power to award sanctions on their own volition as they deem appropriate. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 44 (1991) (discusses inherent power of federal courts stating, "[t]his power reaches both conduct before the court and that beyond the court's confines."); *Shavers v. Shavers,* 2007 WL 312705 at *9 (S.D. Miss. 2007) ("[t]his Court is vested with the inherent power to sanction parties and their attorneys for conduct that abuses the

judicial process.") Accordingly, this Court is not limited to statutory grounds for imposing sanctions as it deems appropriate under the circumstances.

## V.    CONCLUSION

In *Vazzana v. City of Greenville,* 2007 WL 465634 at *4 (N.D. Miss. 2007), the court in considering sanctions under § 11-55-7 stated, "Some cases should be won; some cases should be lost and some cases should never have been filed. This case falls into the latter category." The same is true in the instant case. Notably, in *Vazanna,* the court awarded attorneys' fees and costs despite having denied Defendants' motion for judgment under F.R.C.P. 50(a) at the close of the plaintiff's case.

BOF, a small community bank, has been forced to incur significant expense because of Midwest's fishing expedition which ended without so much as a nibble. "Fishing expedition" might actually be a misnomer, because Midwest knew it wasn't going to catch anything when it embarked on this costly endeavor, as its President Jeff Sternberger so much as admitted. To the contrary, Midwest hoped it could threaten and intimidate BOF into paying an exorbitant ransom in order to avoid the dire future Midwest's counsel tried to paint for BOF, its directors, shareholders and employees—a dire future which Midwest would have Defendant and its agents believe included the decimation of the bank, loss of employment, and financial ruin for its officers and directors--if not jail time.

BOF resisted Midwest's campaign and survived, but at great expense. That expense should be borne by the party which abused the judicial process for an improper purpose, and not BOF. Accordingly, BOF respectfully requests this Honorable Court to award all of its fees and costs incurred in defending this action, or such portion of said fees and costs as the

Court deems just.

**RESPECTFULLY SUBMITTED** this the 30th day of January, 2017.

**BANK OF FRANKLIN, Defendant**

/s/ Mark Wann
S. MARK WANN (MSB No. 6936)
KELLY H. STRINGER (MSB 103293)
JOHN L. MAXEY, II (MSB 1946)
Maxey Wann, P.L.L.C.
210 East Capitol Street, Suite 2100
(39201)
P.O. Box 3977
Jackson, Mississippi 39207
Telephone: 601-355-8855
mark@maxeywann.com

/s/ Matt Quinlivan
MATT QUINLIVAN (MSB No. 103081)
JUDY BURNTHORN (MSB No. 101883)
Deutsch Kerrigan, L.L.P.
2510 14th Street, Suite 1001
Gulfport, MS 39501
Telephone (228)864-0161
mquinlivan@deutschkerrigan.com
jburnthorn@deutschkerrigan.com

/s/ Lane B. Reed
LANE B. REED (MSB 10002)
MARY KATHRYN WILLIAMSON
(MSB 103000)
McGehee, McGehee & Torrey
P.O. Box 188
Meadville, Mississippi 39653
Telephone: 601-384-2343
mmtlaw@mmtlaw.net

**CERTIFICATE OF SERVICE**

I, Matt Quinlivan, hereby certify that on this day I electronically filed the foregoing

pleading or other paper with the Clerk of the Court via the ECF System that served copies upon

all counsel and parties of record.

This, the 30th day of January, 2017.

*/s/ Matt Quinlivan*
MATT QUINLIVAN

Deutsch Kerrigan, L.L.P.
2510 14th Street, Suite 1001
Gulfport, MS  39501
Telephone (228)864-0161
mquinlivan@deutschkerrigan.com