# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
APR 18 2018
ARTHUR JOHNSTON
BY _____ DEPUTY

No. 17-60092

United States Court of Appeals
Fifth Circuit
**FILED**
March 27, 2018
Lyle W. Cayce
Clerk

MIDWEST FEEDERS, INCORPORATED,

        Plaintiff–Appellant,

v.

THE BANK OF FRANKLIN,

        Defendant–Appellee.

Appeal from the United States District Court
for the Southern District of Mississippi

Before HIGGINBOTHAM, PRADO, and HIGGINSON, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Plaintiff–Appellant Midwest Feeders, Inc. ("Midwest") alleges that Defendant–Appellee The Bank of Franklin ("BOF") is liable under Mississippi statutory and common law for its participation in a scheme involving fraudulent checks. Midwest alleges that BOF customer Robert Rawls, an individual with whom Midwest had a financing arrangement, orchestrated a "fictitious payee" scheme. Midwest sued BOF for its alleged participation and negligence regarding this scheme. The district court ruled against Midwest on all of its claims; the court dismissed two claims at the motion to dismiss stage and granted summary judgment with regard to the remaining claims. The court also denied as moot Midwest's motion for discovery sanctions. Midwest appealed. We now AFFIRM.

No. 17-60092

# I. BACKGROUND

A.    **Factual Background**

Midwest is a Kansas-based cattle feedlot business that also "offers financing and credit to customers for procurement of livestock." BOF is a community bank in Mississippi.

### 1. *The Midwest–Rawls Arrangement*

Robert Rawls, individually and doing business as Robert Rawls Livestock and Rawls Trucking, LLC (collectively, "Rawls"), entered a contractual financing relationship with Midwest in 2006. Under the terms of the arrangement, Midwest "provided Rawls secured financing through access to Deposit Account No. **4167 at Alva State Bank & Trust of Alva, Oklahoma." Midwest funded the arrangement by depositing money into the Alva bank account. The arrangement obligated Rawls to use the deposited funds to purchase livestock; Midwest would possess a security interest in the livestock. To this end, Rawls received authorization to write checks drawn on the Alva account, which was labeled "Robert Rawls Livestock." When Rawls drew a check on the account, Midwest would deposit the corresponding amount to the account. After purchasing livestock, Rawls was responsible for reselling the livestock to livestock purchasers. Midwest required Rawls to "issue invoices to livestock purchasers and make arrangements for livestock purchasers to send their payments for the purchase price of the livestock to the Alva State Bank Account by delivery to a specified post office box in Alva, Oklahoma."

In other words, the parties established an arrangement where Rawls would purchase livestock, sell the cattle in inventory—thus creating an account receivable—and the proceeds would be paid directly to the Alva account. The proceeds—the deposits from the purchasers—would cover Rawls's outstanding accounts receivable. For its part in funding the

No. 17-60092

arrangement, Midwest received compensation through fees and interest on outstanding funds.

### 2. BOF's Involvement

In 2008, BOF Executive Vice President Charles Magee solicited Rawls's business. The two had known each other for over thirty years. Despite the overture, Rawls declined.

In 2010, Rawls asked Magee whether BOF would refinance his Alva State Bank & Trust loans. After their initial phone call, the two met in person to discuss. The bank subsequently issued loans to Rawls in the fall of 2010. One loan involved a $750,000 line of credit, and the other was a $500,000 amortized loan. Both loans were secured by real property.

In September 2010, Rawls opened a checking account at BOF in the name of Robert Rawls Livestock. Upon opening his account, Rawls filled out a questionnaire describing the nature of his business. Rawls noted on the questionnaire that he did not accept third-party checks as payment for goods and services.

Soon after opening his account, Rawls's account regularly had uncollected funds. Magee was responsible for overseeing Rawls's bank accounts; he would also process his loans and approve wire transfers when necessary. On several occasions, Magee approved wire transfers of money from the account, even when the account had a six-figure negative balance. Magee believed that he had adequate business justification for approving these transfers: he would approve these transfers "if there was sufficient funds on the line of credit. If [he] didn't think there were sufficient funds on the line of credit, [he] would call [Rawls's] office" to inquire about any forthcoming deposits. Bank employees seeking to wire money from Rawls's overdrawn account would only need Magee's approval in order to wire funds.

3

No. 17-60092

Rawls became one of the top customers at BOF's Brookhaven, Mississippi, branch in terms of the dollar amount of his deposits. Rawls also helped recruit several customers to BOF. Midwest alleges that Rawls received "favorable treatment" during his time as a customer. As an example, Midwest points to a December 2011 loan extension vote before the bank's loan committee. BOF's Vice Chairman Edmund Prestridge voted against extending Rawl's loan because he worried about Rawls's uncollected funds.[1] Nonetheless, the loan committee—including Magee—permitted the extension.

Rawls and Magee also carried on a social relationship during this period. Magee would occasionally visit Rawls's livestock facility, drink beer with him, and watch football games with him. Magee also hunted on property owned by Rawls's family. On several occasions, the two traveled together and attended the same social gatherings. They also exchanged dozens of text messages over the course of Rawls's time as a BOF customer. The messages pertained to a variety of personal and professional matters.

### 3. Rawls's Fraud

Midwest also alleges that during his time as a customer, Rawls began using his Alva account and BOF account to commit fraud. Midwest alleges that Rawls raised red flags for "check kiting."[2] Rawls regularly moved money between banks; he deposited into his BOF account checks drawn on his Alva Account. Midwest alleges that several BOF officers and executives were aware of this. Indeed, in October 2011, Magee became aware that "Robert Rawls was depositing certain checks payable to sellers into his checking account." Magee

---

[1] An internal BOF memorandum memorializes BOF's concerns about Rawls's substantial uncollected funds balance.

[2] "[T]he practice of kiting checks . . . [involves] drawing checks on such accounts in excess of the balances therein due, with such excessive withdrawals being covered by checks drawn on other accounts [] in excess of the balances therein." *Citizens Nat'l Bank v. First Nat'l Bank*, 347 So. 2d 964, 966 (Miss. 1977).

No. 17-60092

claims that Rawls, when confronted, explained that this was a "common practice" in the livestock industry. Magee accepted Rawls's explanation that "depositing checks issued to sellers of cattle into his business checking account" had a legitimate business purpose.

While a BOF customer, Rawls also "created fictitious cattle purchases and diverted money from the Alva account for his personal use." He "made out checks to fictitious payees drawn on the Alva account and endorsed them and stamped them as payable to his livestock company for deposit only. Rawls then deposited the checks into his checking account at Bank of Franklin, which turned them over to Alva for payment." Rawls created corresponding fictitious livestock purchase invoices, as well. Midwest alleges that Rawls issued nearly 900 fraudulent checks between October 2013 and March 2014.

On March 17, 2014, Midwest's President, Jeff Sternberger, spoke with Rawls over the phone. Rawls told Sternberger that he planned to shut down his business. The next day, Sternberger met Rawls at his livestock facility office. Rawls confessed to the scheme. Magee also showed up at Rawls's facility on March 18. He did not see Rawls, who had just left for a medical appointment, but he saw Sternberger; Sternberger told Magee about the fraudulent checks and invoices.

## B.    Procedural Background

On September 5, 2014, Midwest filed suit against BOF. Midwest, demanding a jury trial, alleged six claims against BOF:

(1) Conversion of Instruments (Miss. Code Ann. § 75-3-420);
(2) Failure to Exercise Due Care (Miss. Code Ann. § 75-3-404(d));
(3) Common Law Conversion of Funds;
(4) Common Law Negligence;
(5) Common Law Negligent Hiring and Supervision; and
(6) Common Law Civil Conspiracy.

5

No. 17-60092

The district court dismissed the two conversion-based claims at the motion to dismiss stage. Subsequently, the court entered summary judgment against Midwest on all the remaining claims. On January 18, 2017, the district court entered final judgment, dismissing Midwest's claims with prejudice. Two days later, the district court informed counsel via e-mail that Midwest's pending motion for sanctions was moot. Midwest timely filed notice of appeal.

## II. JURISDICTION

Midwest is a Kansas corporation, and BOF is a Mississippi corporation. Midwest alleges damages in excess of $30 million. Therefore, the district court properly exercised diversity jurisdiction under 28 U.S.C. § 1332. We have jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

### A.   Substantive Law

Because we sit in diversity jurisdiction, we apply Mississippi's substantive law. *Krieser v. Hobbs*, 166 F.3d 736, 739 (5th Cir. 1999); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). And we review de novo the district court's conclusions regarding Mississippi law. *Krieser*, 166 F.3d at 739.

### B.   Summary Judgment

We review summary judgment de novo. *United States v. Lawrence*, 276 F.3d 193, 195 (5th Cir. 2001) (citations omitted). "A summary judgment is only appropriate when, viewing the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law." *Flock v. Scripto–Tokai Corp.*, 319 F.3d 231, 236 (5th Cir. 2003) (citation omitted); *see* Fed. R. Civ. P. 56(a). All reasonable inferences are drawn in favor of the nonmoving party. *Flock*, 319 F.3d at 236 (citation omitted). "In determining whether there is a dispute

6

No. 17-60092

as to any material fact, we consider all of the evidence in the record, but we do not make credibility determinations or weigh evidence." *Id.* (citation omitted).

## C.    Motion to Dismiss

We review de novo the grant of a Rule 12(b)(6) motion. *Pub. Emps. Ret. Sys. of Miss., Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014). During this review, we "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Toy v. Holder*, 714 F.3d 881, 883 (5th Cir. 2013) (citation omitted). To survive this motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## D.    Discovery Sanctions

We review the imposition of discovery sanctions for abuse of discretion. *See Tollett v. City of Kemah*, 285 F.3d 357, 363 (5th Cir. 2002). "An abuse of discretion occurs where the 'ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Id.* (quoting *Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001)).

## IV. DISCUSSION

There are five issues on appeal: (1) Is Midwest among the class of persons to whom § 75-3-404(d) provides a cause of action, allowing it to bring a statutory negligence claim against BOF?; (2) Would the Mississippi Supreme Court find that a bank owes a duty of care to a non-customer, such that Midwest could bring a common law negligence claim against BOF?; (3) Is there a genuine dispute as to a material fact regarding BOF's participation in a civil conspiracy, such that summary judgment is inappropriate?; (4) Did Midwest state a plausible conversion claim under Mississippi Code § 75-3-420?; and (5)

7

No. 17-60092

Did the district court abuse its discretion in dismissing as moot Midwest's motion for sanctions? We answer these questions in turn.

## A. Midwest Lacks a Cause of Action under Mississippi Code § 75-3-404(d)

Section 75-3-404(d) reads:

> With respect to an instrument to which subsection (a) or (b) applies, if a person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from payment of the instrument, *the person bearing the loss* may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

Miss. Code. Ann. § 75-3-404(d) (emphasis added). According to Midwest, it can sue BOF for its alleged negligence in handling Rawls's fraudulent checks. Midwest focuses on the statute's plain language: the statute grants a cause of action to any "person bearing the loss" as a result of a bank's negligence in handling a negotiable instrument. Thus, Midwest suggests that any person who bore a loss due to a bank's negligence in handling a negotiable instrument should be able to sue the bank under § 75-3-404(d).

Midwest is correct to focus on the plain language of the statute. *See City of Tchula v. Miss. Pub. Serv. Comm'n*, 187 So. 3d 597, 599 (Miss. 2016), *reh'g denied* (Apr. 14, 2016) ("No principle is more firmly established . . . than the rule which declares when a law is *plain and unambiguous* . . . the *Legislature shall be deemed to have intended* to mean what they have plainly expressed, and, consequently, no room is left for construction in the application of such a law." (citation omitted)); *see also Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998) ("When the language of a statute is unambiguous we must follow its plain meaning.").

8

No. 17-60092

However, Midwest ignores the broader statutory context in which § 75-3-404(d) fits. *See King v. Burwell*, 135 S. Ct. 2480, 2492 (2015) (reaffirming "the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (quoting *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2441 (2014)). Section 75-3-404(d) is part of Mississippi's codification of the Uniform Commercial Code. *See* Miss. Code Ann. §§ 75-1-101 to 75-11-108. Specifically, § 75-3-404(d) is located within the chapter that governs the enforceability of negotiable instruments. *See* Miss. Code Ann. § 75-3-102(a) ("This chapter applies to negotiable instruments."). This chapter contemplates that only an "aggrieved party" may pursue a cause of action. *See* Miss. Code Ann. § 75-1-305(b) ("The remedies provided . . . must be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed."). And a "party" is defined as "a party to an instrument." Miss. Code Ann. § 75-3-103(a)(10). Midwest is not a party to any of the instruments in question—it was not identified on the subject checks, did not possess the subject checks, and was not entitled to enforce the subject checks. *See Am. Nat'l Ins. Co. v. Citibank, N.A.*, 543 F.3d 907, 910 (7th Cir. 2008) ("[The plaintiff] appears to be confusing an interest in the funds backing the checks with an interest in the checks themselves."). Midwest was not an aggrieved party, so it cannot seek a remedy under § 75-3-404(d).

The UCC's Official Comments further support this reading. We agree with BOF's reading of the comments, which "illustrate that the remedy available under section 75-3-404(d) is only available to a party to the instrument." Mississippi courts give "significant weight" to those comments. *See Hancock Bank v. Ensenat*, 819 So. 2d 3, 10 (Miss. Ct. App. 2001). No comment contemplates a depository bank's liability to an entity that is not party to the negotiable instrument; the comments only provide examples

9

where either the drawer of the check or the drawee bank is the injured party.[3]
*See* Miss. Code. Ann. § 75-3-404, cmts. 1–3.

Midwest may very well be a "party bearing the loss" under the ordinary
meaning of that phrase. However, we are unwilling to apply the ordinary
meaning of the phrase when, in context, § 75-3-404(d) only provides a cause of
action to a party to the negotiable instrument. By placing § 75-3-404(d) in this
context in the overall statutory scheme, it is clear that Mississippi's chapter
governing negotiable instruments does not contemplate the extension of
liability to any party who bore any loss as a result of a depository bank's
negligence in regard to the handling of a negotiable instrument. Therefore, we
AFFIRM the district court's summary judgment against Midwest with regard
to its statutory negligence claim.[4]

## B.    BOF Owes a Duty to Midwest

The next issue is whether Midwest can assert common law negligence
claims against BOF, even though Midwest was never BOF's customer.
Mississippi requires that the plaintiff establish "the traditional elements of
negligence: duty or standard of care, breach of that duty or standard,
proximate causation, and damages or injury." *Lyle v. Mladinich*, 584 So. 2d
397, 398–99 (Miss. 1991). "The important component of the existence of the
duty is that the injury is 'reasonably foreseeable.'" *Id.* at 399. "Whether a duty
exists is a question of law." *Id.* at 400 (citation omitted).

---

[3] BOF also asserts that a Pennsylvania state court, interpreting an identical statute,
limited recovery to only those who are parties to the negotiable instrument. *See Victory
Clothing Co. v. Wachovia Bank, N.A.*, No. 1397, 2006 WL 773020, at *6 (Pa. Ct. Com. Pl. Mar.
21, 2006) ("[T]he drawer now has the right to sue the depositary bank directly based on the
bank's negligence.").

[4] BOF does not argue that § 75-3-404(d) pre-empts Midwest's attempt to pursue
negligence claims based in the common law. BOF only argued that Mississippi law pre-
empted Midwest's common law conversion claim—a claim that Midwest apparently conceded
on appeal.

No Mississippi case directly addresses whether a bank may owe a duty to a non-customer in circumstances resembling this case. Thus, the district court made an *Erie* guess as to whether the Mississippi Supreme Court would—as a matter of law—permit Midwest to bring negligence claims against BOF. The court analyzed relevant cases from the Mississippi Supreme Court, but it acknowledged that no case directly addressed the issue. The district court then assessed cases from intermediate Mississippi courts, in addition to surveying other jurisdictions. The district court ultimately granted summary judgment for BOF, finding that Midwest's negligence-based claims failed as a matter of law. The district court was "unpersuaded that the Mississippi Supreme Court would find that the Bank of Franklin owed any duty to Midwest Feeders, a non-customer whose name did not appear on any of the checks at issue, and with which the bank had no relationship." According to the district court, "a bank does not assume a duty to non-customers by merely engaging in questionable banking practices or failing to adequately train its employees." Thus, the district court found that "[a]bsent any duty owed by the Bank of Franklin . . . Midwest's negligence based claims fail as a matter of law." The court also expressed concern that finding that BOF owed a duty to Midwest may expose BOF to "unlimited liability for unforeseeable frauds," which would impose dramatic investigatory burdens on banks to ensure the validity and legality of their customers' transactions. *See Shreveport Prod. Credit Ass'n v. Bank of Commerce*, 405 So. 2d 842, 845–46 (La. 1981). We now AFFIRM the district court's determination that Midwest cannot as a matter of Mississippi law assert a claim of common law negligence against BOF.

\* \* \*

No Mississippi Supreme Court decision directly addresses whether—and in what circumstances—a bank owes a duty of care to non-customers. Therefore, we must make an *Erie* guess as to whether the Mississippi Supreme

Court would recognize such a duty. *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992) ("When there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide.").

The only decision by the Mississippi Supreme Court pertaining to this issue is *Citizens Nat'l Bank v. First Nat'l Bank*, 347 So. 2d 964 (Miss. 1977). There, First National Bank discovered that some of its customers were involved in a "check kiting" scheme, but the bank did not inform Citizens National Bank of that discovery. *Id.* at 966. The Mississippi Supreme Court first assessed "whether First National Bank had a legal duty to notify Citizens National Bank that it was convinced that [a customer with accounts at both First National and Citizens National] was kiting checks." *Id.* at 967. The Mississippi Supreme Court noted that the banks were "competitors in the banking field" and "ordinarily[,] banks deal with each other at arm's length." *Id.* The court then concluded that "First National Bank had no duty to inform Citizens National Bank that [the customer] was kiting checks." *Id.* The court reasoned that the plaintiff failed to "allege any circumstances or facts that tend to show that a confidential or fiduciary relationship existed between these two banks," nor did the plaintiff "show that there is any requirement in the banking field that one bank notify another of its discovery of a customer kiting checks." *Id.*

*Citizens National* offers us only limited guidance. The Mississippi Supreme Court emphasized that the two parties were *competing banks* before deciding that no legal duty to inform the other bank about fraud may arise unless a "confidential or fiduciary relationship" existed. *Id.* Here, the parties in this case are not competitors, and Midwest is not a bank.

Given the limited guidance from the Mississippi Supreme Court, we may look to the decisions of a state's intermediate courts. *See Transcon. Gas Pipe*

No. 17-60092

*Line Corp.*, 953 F.2d at 988. The parties cite two cases from the Mississippi Court of Appeals: *Holifield v. BancorpSouth, Inc.*, 891 So. 2d 241 (Miss. Ct. App. 2004), and *Delta Chem. & Petroleum, Inc. v. Citizens Bank of Byhalia, Miss.*, 790 So. 2d 862 (Miss. Ct. App. 2001). These cases help, but they do not settle the matter.

In *Holifield*, the Mississippi Court of Appeals addressed a situation where investors in a trust sued a depository bank for its alleged negligence in handling transactions by its customer, the trustee; the investors were not the bank's customers. *See* 891 So. 2d at 242–45. The non-customers claimed that the bank owed them a duty of care to scrutinize the trustee's fraudulent transactions, so the bank could be liable under common law negligence principles. *See id.* at 243–44. The Mississippi Court of Appeals held that the bank could not be liable in that case because it had no actual knowledge of the trustee's fraudulent activity, nor did the bank know of the fiduciary arrangement between the trustee and the investors. *See id.* at 249–50. Yet, the persuasive value of this holding appears limited. The Mississippi Court of Appeals focused its analysis regarding the bank's alleged duty on statutory and common law *trust law* principles. *Id.* at 247–50. Moreover, the court held that "since the bank had no actual knowledge of the customer's alleged frauds, it had no liability." *Id.* at 242. However, the opinion does not address whether the bank *should have known* of the customer's alleged fraud (and whether that constructive knowledge may give rise to liability).[5] Thus, *Holifield* does not leave us with a clear answer.

---

[5] To the extent *Holifield* permits a claim to proceed on the basis of the bank's actual knowledge, as opposed to what the bank should have known, we read that principle to derive from the Mississippi law of *trusts*, not the general law of negligence. Mississippi negligence law makes clear that a party may owe a duty to one who is injured by a foreseeable intervening cause. *See Southland Mgmt. Co. v. Brown ex rel. Brown*, 730 So. 2d 43, 46 (Miss. 1998) ("[U]nder principles of 'foreseeability,' a defendant may be held liable for his failure to

13

No. 17-60092

In *Delta*, the Mississippi Court of Appeals confronted a situation where a bank was sued by a non-customer for its negligent decision to allow a customer to open allegedly fraudulent bank accounts. 790 So. 2d at 864–68. The court did not did not reach the issue of the depository bank's negligence; instead, the court focused on whether the customer had the authority as an agent to open the accounts. *Id.* at 871–76. Thus, the Court of Appeals did not reach the question of whether a bank may owe a duty of care to a non-customer.[6]

Thus, we are left to survey other jurisdictions to inform our *Erie* guess. *See Rogers v. Hartford Life & Acc. Ins. Co.*, 167 F.3d 933, 940 (5th Cir. 1999); *see also Guilbeau v. Hess Corp.*, 854 F.3d 310, 312 n.4 (5th Cir. 2017) (noting the "various sources" to which the court looks when "making an *Erie* guess").

We look first to *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220 (4th Cir. 2002), which is the most persuasive case BOF cites. There, the Fourth Circuit addressed the question of "whether a bank owes a duty of care to a noncustomer who is defrauded by the bank's customer through use of its services." *Id.* at 225. The court, applying North Carolina law, made an *Erie* guess. *Id.* The court determined that "[c]ourts in numerous jurisdictions have held that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship." *Id.* at 225 (citing cases from Colorado, Rhode Island, Texas, California, Michigan, New Jersey, and New York). The Fourth

---

anticipate an easily-predicted intervening cause and to properly guard against it."); *Touche Ross & Co. v. Commercial Union Ins. Co.*, 514 So. 2d 315, 323 (Miss. 1987) ("In Mississippi, actionable fault must be predicated upon action or inaction, prompted by knowledge, actual or implied, of facts which make the result of the defendant's conduct not only the probable result but also a result which the defendant should, in view of the facts, have reason to anticipate."). Actual knowledge is not required.

[6] To the extent that the *Delta* court discussed a bank's duties of care and reasonableness, it did so in the context of a statutory conspiracy to defraud claim. *See* 790 So. 2d at 875–78. This analysis does not apply to a claim of common law negligence.

14

Circuit then analyzed the relationship between the parties. It concluded that the plaintiff fell "into the undefined and unlimited category of strangers who might interact with Wachovia's bank customer." *Id.* at 226. Accordingly, the Fourth Circuit was reluctant to extend a duty of a care to a non-customer in that situation; the court worried about creating an impermissibly broad scope of liability for a bank. *Id.* at 226–27. The Fourth Circuit concluded that "Wachovia did not owe Eisenberg a duty of care under the facts of this case." *Id.* Other cases echo *Eisenberg*'s holding.[7]

In response, Midwest argues that while banks generally do not owe a duty of care to non-customers, there are specific circumstances in which such a duty may exist. Midwest cites our decision in *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219 (5th Cir. 2010).[8] There, we applied New York law to determine a depository bank's liability toward a non-customer. *Id.* at 229–32. Citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006), we recognized that banks

---

[7] *See, e.g., SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 357 (6th Cir. 2014) ("The almost-universal law in this country is that banks owe a duty of care only to their own customers."); *El Camino Res., LTD. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 907 (W.D. Mich. 2010), *aff'd*, 712 F.3d 917 (6th Cir. 2013) ("Michigan law, in accord with the universal rule in this country, holds that a bank's relationship is with its customer and that the bank owes third parties no duty of care to monitor a customer's activities." (citation omitted)). The Second Circuit in *Lerner* recognized that, "[a]s a general matter, '[b]anks do not owe non-customers a duty to protect them from the intentional torts of their customers.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) (citations omitted). The court justified this holding in public policy terms. *Id.* The Second Circuit feared that imposing upon a bank a duty of care toward non-customers would unreasonably expand the scope of the bank's duty. *Id.* There are billions of banking transactions in New York, and the Second Circuit feared that a bank could be liable for unforeseen risks. *Id.*

[8] Midwest also cites *In re: Liberty State Benefits of Del., Inc.*, 541 B.R. 219, 251 (Bankr. D. Del. 2015) (recognizing a common law duty owed to a non-customer because the bank knew of the non-customer's interest in a customer's account), and *Miller v. Bennet*, No. 13CA010336, 2014 WL 2567925, at *2–4 (Ohio Ct. App. June 9, 2014) (finding that a bank owed a statutory duty under the UCC to exercise ordinary care toward non-customers in a situation involving fraudulently-endorsed financing instruments).

generally owe no due to a non-customer. *Chaney*, 595 F.3d at 232. However, we clarified that "this rule is not without exception," explaining that:

> New York courts have recognized that a bank may be held liable for its customer's misappropriation where (1) there is a fiduciary relationship between the customer and the non-customer, (2) the bank knows or ought to know of the fiduciary relationship, and (3) the bank has "actual knowledge or notice that a diversion is to occur or is ongoing."

*Id.* (citation omitted). Although we subsequently concluded that the bank in that case lacked the requisite knowledge of a fiduciary relationship between a customer and non-customer, *id.* at 233, *Chaney* supports Midwest's argument that banks are not categorically precluded from owing a duty of care to a non-customer.

The Eleventh Circuit in *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094–95 (11th Cir. 2017), reached a similar conclusion. Applying Florida law, the court recognized that banks generally owe no duty of care to a non-customer with whom the bank has no relationship. *Id.* at 1094. However, the Eleventh Circuit clarified that:

> [T]here is an exception to this rule: a bank may be liable to a noncustomer for its customer's misappropriation when a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary relationship, and the bank has actual knowledge of its customer's misappropriation.

*Id.* at 1094–95 (citations omitted). The court concluded that the plaintiff had adequately stated a claim for negligence, based in part on this duty. *See id.* at 1097.

Even the cases BOF cites contemplate that a bank may owe a duty to a non-customer in certain circumstances. The Fourth Circuit's *Eisenberg* decision looked at the nature of the "relationship" (or the lack thereof) between the bank and non-customer. *See* 301 F.3d at 225. Also, the Second Circuit's

holding in *Lerner* is distinguishable. The Second Circuit invoked the argument that a bank generally owes no duty to a non-customer when discussing the claims of a certain set of plaintiffs—investors who were defrauded in a Ponzi scheme, were unknown to the bank, and whose particular funds had never been deposited at the defendant bank. 459 F.3d at 286–87. Finding that a bank owes no duty to a non-customer when the non-customer is unknown to the bank and the bank has not been entrusted with the non-customer's funds, however, is consistent with finding that a bank may owe a duty to a non-customer when the bank is *aware* of a non-customer's fiduciary relationship with one of its customers.

Thus, caselaw supports the idea that while a bank generally owes no duty to a non-customer, the bank may owe such a duty to a non-customer where "a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary relationship, and the bank has actual knowledge of its customer's misappropriation." *Chang*, 845 F.3d at 1094–95. These cases strike an appropriate balance between imposing liability on a bank and the non-customer's legitimate right to recovery. Banks are discouraged from willfully ignoring warning signs that its customer may be committing an intentional tort against the non-customer (with whom the customer has a fiduciary relationship). Yet, banks are not exposed to liability to unforeseeable actors (e.g., creditors who may be harmed as a result of the non-customer's losses). Nor is a bank automatically liable for negligence even if a duty exists; a bank could only be liable if it fell below a standard of ordinary care for a similarly situated, reasonably prudent bank. The bank could also defend itself on the grounds that the non-customer was comparatively negligent. *See Burton by Bradford v. Barnett*, 615 So. 2d 580, 582 (Miss. 1993) (noting that Mississippi follows the law of comparative negligence).

No. 17-60092

* * *

Despite the merits of this line of cases, we recognize that we cannot use our *Erie* guess to impose upon Mississippi a new regime of liability for its banks. *See Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 243–44 (5th Cir. 2012) ("When making an *Erie* guess, our task is to attempt to predict state law, not to create or modify it.") (quoting *SMI Owen Steel Co. v. Marsh USA, Inc.*, 520 F.3d 432, 442 (5th Cir. 2008)). Given the current state of Mississippi's caselaw, including *Holifield*, *see supra* note 5, we do not predict that the Mississippi Supreme Court would impose upon BOF a duty of reasonable care to Midwest, a non-customer. Therefore, we AFFIRM the district court's summary judgment.

## C.    Midwest Failed to Allege the Existence of a Civil Conspiracy

Mississippi law provides that "[a] conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Levens v. Campbell*, 733 So. 2d 753, 761 (Miss. 1999). "To establish a civil conspiracy, the plaintiff must prove (1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damages to the plaintiff as a proximate result." *Bradley v. Kelley Bros. Contractors, Inc.*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013) (footnote and citations omitted). The agreement between the parties "need not extend to all details of the scheme and may be express, implied, or based on evidence of a course of conduct." *Id.* at 339. Moreover, "the alleged confederates must be aware of the fraud or wrongful conduct at the beginning of the agreement." *Id.* "Conspiracies are predominantly proved with circumstantial evidence since direct evidence of an explicit agreement rarely exists." *Cooper Tire & Rubber Co. v. Farese*, No. 3:02CV210-SA, 2008 WL 4285546, at *3 (N.D. Miss. Sept. 12, 2008). "[I]nferences favorable to the plaintiff must be within the range of reasonable

18

probability and it is the duty of the court to withdraw the case from the jury if the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Harris v. Miss. Valley State Univ.*, 873 So. 2d 970, 981 (Miss. 2004) (citation omitted).

The district court concluded that the evidence presented "offer[ed] no more than speculation and conjecture insufficient to create a genuine issue of material fact." The court noted that "to accept the conspiracy theory advanced by Midwest Feeders would require the fact-finder to pile inference upon inference, namely that Magee knew of Rawls'[s] fraudulent scheme, that he agreed to conspire with Rawls, and that he acted on behalf of the Bank of Franklin in furtherance of that agreement." The district court focused its analysis on the personal relationship between Rawls and Magee, finding that a personal relationship alone cannot establish the existence of a conspiracy. *See Delta Chem.*, 790 So. 2d at 878.

Midwest argues that the district court failed to consider circumstantial evidence regarding the existence of an agreement between BOF and Rawls. Midwest alleges that the district court failed to give weight to "BOF eagerly pursuing Rawls'[s] business, overlooking Rawls'[s] high uncollected funds balance, approving wires from Rawls'[s] account when overdrawn by hundreds of thousands of dollars, and accepting numerous Fraud Checks from Rawls with no endorsement." Midwest argues that this course of performance— *coupled* with the "unprofessionally close relationship between Rawls and Magee"—suffices to permit a juror to infer the existence of a civil conspiracy.

BOF responds by arguing that that Midwest "did not demonstrate a genuine issue of material fact on its claim for civil conspiracy," despite "[e]xtensive discovery." BOF cites *Delta* for the proposition that even if one party receives "some favorable loans and other items of compensation due to their personal relationship with [the alleged co-conspirator] [does] not *ipso*

*facto* create the existence of a conspiracy." *See Delta Chem.*, 790 So. 2d at 878. The *Delta* court affirmed the district court's conclusion with regard to one alleged co-conspirator. *Id.*

However, the *Delta* court also reversed a directed verdict regarding another alleged co-conspirator. *Id.* The *Delta* court focused on "specific acts" committed by a bank employee to determine whether he may have been part of the alleged conspiracy. *Id.* The court concluded that "differing conclusions, as to the activities of [an alleged co-conspirator], as an employee of [the defendant bank], could be reached on the issue of his involvement in the alleged conspiracy." *Id.* Thus, the court found it appropriate to send that issue to a jury trial, as opposed to deciding the issue on a directed verdict. *Id.*

Yet, BOF argues that the overt acts in *Delta*, which justified reversing the directed verdict, are a far cry from the circumstantial evidence that Midwest produced in this case. The acts by the alleged co-conspirator bank employee in *Delta* included: (1) opening sham accounts for the co-conspirator; (2) acting as the only employee reviewing banking statements related to those accounts; and (3) retaining and using endorsement stamps for those sham accounts. *Delta*, 790 So. 2d at 877.

We conclude, following *Delta*, that the evidence presented fails to establish the plausible existence of a civil conspiracy. Although civil conspiracy can be—and often is—established through circumstantial evidence, the evidence of the close personal relationship between Rawls and Magee does not rise to the level necessary to establish that a civil conspiracy existed. Such an inference would "rest[] merely upon speculation and conjecture," and thus it is our duty to "withdraw the case from the jury." *Harris*, 873 So. 2d at 981 (citation omitted). Therefore, we AFFIRM the district court's summary judgment against Midwest with regard to the civil conspiracy claim.

No. 17-60092

**D.     Midwest Failed to Plausibly Allege a Conversion Claim under Mississippi Code § 75-3-420**

Midwest alleged two conversion claims: one under Mississippi Code and another under Mississippi common law. At the motion to dismiss stage, the district court correctly determined that Mississippi code preempted Midwest's common law conversion claim. *See Berhow v. The Peoples Bank*, 423 F. Supp. 2d 562, 567–68 (S.D. Miss. 2006) ("[Miss. Code Ann.] § 75-3-420 displaces [the plaintiff's] common law claims insofar as her common law claims relate to the conversion of the instruments."). After assessing the party's arguments, the district court subsequently dismissed the statutory conversion claim. The court reasoned that Midwest "can show nothing more than an interest in the funds behind the forged checks, [so] it cannot maintain an action in conversion against Bank of Franklin." The question on appeal is whether the district court erred in dismissing Midwest's § 75-3-420 conversion claim due to Midwest's lack of interest in the instruments. We AFFIRM the district court's dismissal.

Section 75-3-420 establishes, in relevant part, that:

> An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee.

Miss. Code. Ann. § 75-3-420(a). Midwest reiterates its statutory conversion claim on appeal, and it asserts that it possessed a sufficient interest in the converted negotiable instruments to bring a conversion claim.

BOF argues that Midwest lacked any interest in the negotiable instrument; Midwest was not a person entitled to enforce the instrument, it had no rights in the instrument, and it was not an entity recognized on the

21

instrument itself. Therefore, it lacked any property interest in the check that could be converted.

BOF relies on the Seventh Circuit's opinion in *American National Insurance Co. v. Citibank, N.A.*, 543 F.3d 907 (7th Cir. 2008). There, the Seventh Circuit found that, under a similar Illinois statute, a party "cannot sue for conversion, because its only interest [was] a derivative claim to the funds, not a claim to the instruments themselves." *Am. Nat'l*, 543 F.3d at 910. The Seventh Circuit emphasized that in order to bring a conversion claim, a party would need to have a property interest in the instrument itself. *Id.* (concluding that the plaintiff had "no property interest in the checks at issue here: it [was] not a payee, indorsee, or any other entity recognized upon the instruments themselves"). Instead, the plaintiff had only an equitable interest in the checks. *See id.* According to BOF, the situation here is analogous because Midwest only has an equitable interest in the checks; it has no property interest in the checks themselves. Thus, asserts BOF, Midwest cannot bring a conversion claim.

Midwest attempts to distinguish *American National* on the grounds that the plaintiff in that case lacked any direct interest in the instruments. Midwest alleges that in this case, it had a direct interest in the instruments because it had "deposited funds into the account upon which BOF drew the Fraud Checks." Thus, Midwest argues, it had a property interest in the checks—as opposed to merely an equitable interest.

However, as BOF and the district court recognized, Midwest's conception of conversion would place an undesirable burden on banks. As the Seventh Circuit found,

> Instead of being able to look at the payee line and to verify that the person presenting the check was indeed entitled to do so, banks in [the plaintiff's] world would need to conduct a full-blown investigation every time to make sure that a party with an

No. 17-60092

> equitable interest in the check was not lurking in the background. Such a system would bring commercial transactions to a grinding halt.

*Am. Nat'l*, 543 F.3d at 909–10. Thus, we agree with the Seventh Circuit that Midwest cannot bring a conversion claim because it lacks a property interest in the checks; Midwest merely has an interest in the funds *behind* the checks.

Midwest, citing Mississippi Code § 75-3-306, also argues that it maintained an interest in the negotiable instrument's proceeds. Section 75-3-306 states in relevant part that "[a] person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds." Miss. Code Ann. § 75-3-306. Midwest asserts this means that it had an interest in the instruments' proceeds, thus it stated a plausible claim for conversion. However, Midwest raised this specific argument for the first time on appeal. Thus, we reject this new theory as forfeited. *See Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999).

We AFFIRM the district court's decision to dismiss the conversion claim. Midwest lacks a cognizable interest in the negotiable instruments for the purposes of § 75-3-420.

## E. The District Court Did Not Abuse Its Discretion by Dismissing as Moot Midwest's Motion for Sanctions

Midwest asserts that the district court erred by never ruling on a motion for sanctions. Midwest filed the motion for sanctions—alleging that BOF acted improperly during the course of discovery—hours before the district court issued its ruling on the motion for summary judgment. Days after the ruling, counsel e-mailed the district court regarding the status of the motion for sanctions. The district court responded that: "In light of [its] Order and Final Judgment, Midwest's Motion for Sanctions is moot. No further response is needed."

23

No. 17-60092

Midwest asserts that dismissal was improper, and the court incorrectly applied the doctrine of mootness to the issue. In support of its position, Midwest cites an out-of-circuit case for the proposition that "the district court must address BOF's conduct to maintain compliance with the rules and public confidence in the judicial system." *See Anchondo v. Anderson, Crenshaw & Assocs.*, No. CV 08–202 RB/WPL, 2011 WL 4549279, at *6 (D. N.M. Sept. 29, 2011). In response, BOF asserts that it was within the district court's discretion to dismiss the motion.

We conclude that the district court did not abuse its discretion by denying the imposition of discovery sanctions. *See Tollett*, 285 F.3d at 363. Even if the district court imprecisely used the word "moot," we are not persuaded that such minor error constitutes an abuse of discretion *that* justifies our intervention. And Midwest cites no case to the contrary.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court on all issues.